No. 23-35014

IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

---

MONTANA MEDICAL ASSOCIATION; FIVE VALLEYS UROLOGY, PLLC; PROVIDENCE HEALTH & SERVICES – MONTANA; WESTERN MONTANA CLINIC, PC; PAT APPLEBY; MARK CARPENTER; DIANA JO PAGE; WALLACE L. PAGE; CHEYENNE SMITH,

Plaintiffs - Appellees,

MONTANA NURSES ASSOCIATION,

Intervenor-Plaintiff – Appellee,

v.

AUSTIN KNUDSEN, Montana Attorney General; LAURIE ESAU, Montana Commissioner of Labor and Industry,

Defendants – Appellants.

---

On Appeal from the Missoula Division of the
United State District Court, District of Montana
No. 9:21-cv-00108-DWM
Hon. Donald W. Molloy

---

**APPELLEES' ANSWERING BRIEF**

---

Justin K. Cole
Kathryn S. Mahe
GARLINGTON, LOHN & ROBINSON, PLLP
350 Ryman Street • P.O. Box 7909
Missoula, MT 59807-7909
Phone (406) 523-2500
Fax (406) 523-2595
jkcole@garlington.com
ksmahe@garlington.com
 *Attorneys for Plaintiffs - Appellees*

Raph Graybill
GRAYBILL LAW FIRM, PC
300 4th Street North
Great Falls, MT 59403
Phone: (406) 452-8566
rgraybill@silverstatelaw.net
 *Attorney for Plaintiff-Intervenor - Appellee*

## CORPORATE DISCLOSURE STATEMENT

Plaintiff-Appellees Montana Medical Association, Five Valleys Urology, PLLC ("Five Valleys"), and Western Montana Clinic, PC ("Clinic"), and Plaintiff-Intervenor Appellee Montana Nurses Association ("Nurses") hereby state that there is no parent corporation or publicly held corporation that owns 10% or more of their stock.

Plaintiff-Appellee Providence Health & Services – MT ("Providence") states that it is non-profit corporation formed in Montana. The sole corporate member is Providence Health & Services, a Washington non-profit corporation.

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ....................................................................1

II.   JURISDICTIONAL STATEMENT ....................................5

III.  ISSUES PRESENTED ..........................................................5

IV.  STATEMENT OF THE CASE .............................................6

V.   SUMMARY OF THE ARGUMENT ..................................12

VI.  STANDARD OF REVIEW ...............................................13

VII. ARGUMENT.....................................................................15

     A.   The district court appropriately determined
           MCA 49-2-312 is preempted by Federal law.....................15

         1.    The district court correctly determined
                MCA 49-2-312 is preempted by the ADA...............................15

              a.    The district court correctly determined
                    that, because MCA 49-2-312 interferes
                    with the employer and public accommodation
                    requirements of the ADA, it is preempted.....................16

              b.    Appellants' arguments misstate the facts,
                    misconstrue the law, and do not support
                    overturning the district court's decision. ........................21

         2.    The district court correctly determined
                 MCA 49-2-312 is preempted by the OSH Act. ........................30

         3.    The district court correctly determined
                  MCA 49-2-312 was preempted by CMS
                 Regulations, and properly fashioned this
                 limited aspect of its injunction...................................42

ii

B.  The district court correctly held MCA 49-2-312
is unconstitutional, as it violates the equal protection
safeguards of the Montana and United States Constitutions. .............45

1.  The district court correctly found these
three classes are similarly situated.............................................47

2.  MCA 49-2-312 fails rational basis scrutiny
because its disparate classifications
have no relationship whatsoever to the
purported state interest.............................................................51

VIII.  CONCLUSION.................................................................................60

STATEMENT OF RELATED CASES

CERTIFICATE OF COMPLIANCE

ADDENDUM

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Ariz. Dream Act Coal. v. Brewer*,
855 F.3d 957 (9th Cir. 2017) ..................................... 13-14, 47-48, 50-51, 56

*Armstrong v. Exceptional Child Ctr., Inc.*,
575 U.S. 320 (2015)...................................................................................24

*Arneson v. State by & Through its Dep't of Admin., Teachers' Ret. Div.*,
864 P.2d 1245 (1993) ..................................................................................46

*Bd. of Trs. of the Glazing Health & Welfare Tr. v. Chambers*,
941 F.3d 1195 (9th Cir. 2019) ......................................................................44

*Biden v. Missouri*,
142 S. Ct. 647 (2022)......................................................6-7, 39, 52-53, 59

*Boardman v. Inslee*,
978 F.3d 1092 (9th Cir. 2020) ......................................................................50

*Cal. Stevedore & Ballast Co. v. OSHRC*,
517 F.2d 986 (9th Cir. 1975) ................................................................ 39-40

*Christian Heritage Acad. v. Okla. Secondary Sch. Activities Ass'n*,
483 F.3d 1025 (10th Cir. 2007) ....................................................................56

*City of Cleburne v. Cleburne Living Ctr.*,
473 U.S. 432 (1985)..........................................................................58-59

*Columbia Pictures Indus. v. Gary Fung*,
710 F.3d 1020 (9th Cir. 2013) ......................................................................13

*Crowder v. Kitagawa*,
81 F.3d 1480 (9th Cir. 1996) ........................................................................16

*Divne Allah v. Goord*,
405 F.Supp 2d 265 (S.D.N.Y. 2005) ............................................................27

*DOC v. New York*,
139 S. Ct. 2551 (2019)......................................................................... 25-26

iv

*Donovan v. Royal Logging Co.*,
645 F.2d 822 (9th Cir. 1981) .................................................. 31-32

*E.T. v. Paxton*,
41 F.4th 709 (5th Cir. 2022) .........................................................25

*Edmo v. Corizon, Inc.*,
935 F.3d 757 (9th Cir. 2019) .......................................................13

*English v. Gen. Elec. Co.*,
496 U.S. 72 (1990).......................................................................15

*Gade v. Nat'l Solid Wastes Mgmt. Ass'n*,
505 U.S. 88 (1992)...................................................... 15, 31, 36-38

*Gallinger v. Becerra*,
898 F.3d 1012 (9th Cir. 2018) .....................................................46

*Google LLC v. Oracle Am., Inc.*,
141 S. Ct. 1183 (2021)........................................................... 30-31

*Harrison v. Kernan*,
971 F.3d 1069 (9th Cir. 2020) ................................................ 47-48

*Hensley v. Mont. State Fund*,
477 P.3d 1065 (Mont. 2020) ................................................... 46-48

*Jacobson v. Massachusetts*,
197 U.S. 11 (1905)................................................................ 45, 54

*Johnson v. Brown*,
567 F. Supp. 3d 1230 (D. Or. 2021) ....................................... 54-55

*Mary Jo C. v. N.Y. State & Local Ret. Sys.*,
707 F.3d 144 (2d Cir. 2013) ........................................................20

*McDermott v. State Dep't of Corr.*,
29 P.3d 992 (Mont. 2001)....................................................... 45-46

*McGary v. City of Portland*,
386 F.3d 1259 (9th Cir. 2004) .....................................................16

*Melendres v. Arpaio*,
784 F.3d 1254 (9th Cir. 2015) .....................................................13

*Merrifiend v. Lockyer*,
547 F.3d 978 (9th Cir. 2008) .......................................................56

v

*Mont. Cannabis Indus. Ass'n v. State*,
    286 P.3d 1161 (Mont. 2012)..........................................................................56

*NASD Disp. Res., Inc. v. Jud. Couns.*,
    488 F.3d 1065 (9th Cir. 2007) ............................................................. 44-45

*Nat'l Realty & Constr. Co. v. Occ. Safety & Health Rev. Comm'n*,
    489 F.2d 1257 (D.C. Cir. 1973).................................................................39

*Nordlinger v. Hahn*,
    505 U.S. 1 (1992)........................................................................................50

*Nw. Acceptance Corp. v. Lynnwood Equip., Inc.*,
    841 F.2d 918 (9th Cir. 1988) .......................................................................2

*Pom Wonderful L.L.C. v. Hubbard*,
    775 F.3d 1118 (9th Cir. 2014) ...................................................................14

*Reich v. Mont. Sulphur & Chem. Co.*,
    32 F.3d 440 (9th Cir. 1994) ............................................................ 31, 35-36

*Romer v. Evans*,
    517 U.S. 620 (1996)...................................................................................59

*Saltarelli v. Bob Baker Group Med. Trust*,
    35 F.3d 382 (9th Cir. 1994) .......................................................................14

*Seaman v. Virginia*,
    593 F. Supp. 3d 293 (W.D. Va. 2022)................................................ 25-26

*Serv. Emps. Int'l Union, etc. v. Fair Political Practices Com.*,
    955 F.2d 1312 (9th Cir. 1992) ...................................................................14

*Shaikh v. Tex. A&M Univ. Coll. of Med.*,
    739 Fed. App'x. 215 (5th Cir. 2018) .........................................................23

*Silveira v. Lockyer*,
    312 F.3d 1052 (9th Cir. 2002) ...................................................................56

*Snapp v. United Transp. Union*,
    889 F.3d 1088 (9th Cir. 2018) ............................................................ 16, 24

*Taylor v. Phoenixville Sch. Dist.*,
    184 F.3d 296 (3rd Cir. 1999)................................................................ 22-23

*Valle del Sol Inc. v. Whiting*,
    732 F.3d 1006 (9th Cir. 2013) ...................................................................25

*Yu v. Idaho State Univ.*,
    15 F.4th 1236 (9th Cir. 2021) ........................................................30

*Zivkovic v. S. Cal Edison Co.*,
    302 F.3d 1080 (9th Cir. 2002) ...............................16-17, 22-23

*Zucht v. King*,
    260 U.S. 174 (1922).............................................................54-55

**Statutes**

42 U.S.C. § 12112(a) ..........................................................................15

42 U.S.C. § 12112(b) ..........................................................................24

42 U.S.C. § 12112(b)(5)(A) ................................................................16

42 U.S.C. § 12181(7)(f) ......................................................................17

42 U.S.C. § 12182(a) ........................................................ 15, 17, 19, 26

42 U.S.C. § 12182(b)(2)(A)(ii) ....................................................... 17, 26

Mont. Code Ann. § 20-5-403(1) ........................................................59

Mont. Code Ann. § 37-3-101 ......................................................... 50-51

Mont. Code Ann. § 37-8-101 ......................................................... 50-51

Mont. Code Ann. § 37-20-101 ....................................................... 50-51

Mont. Code Ann. § 49-2-312 ...............................1-7, 10-13, 15-30, 32-33,
    ...................................................................35-39, 41-46, 51-57, 59-60

Mont. Code Ann. § 49-2-312(3)(b) ............................................... 28, 47

Mont. Code Ann. § 49-2-312(3)(b)(ii) ...............................................29

Mont. Code Ann. § 49-2-313 ...............................1, 4-5, 47, 52, 54

Mont. Code Ann. § 50-5-101(26)(b) ........................................ 28, 47, 53

**Other Authorities**

86 Fed. Reg. 61555 (Nov. 5, 2021).....................................................42

88 Fed. Reg. 36485 (June 5, 2023) ............................................... 43-44

vii

**Rules**

28 C.F.R. § 35.130(b)(7) ................................................................ 17, 26

Fed. R. App. P. 28(a)(4) ..................................................................... 2

Fed. R. Civ. P. 52(a)(6) .................................................................... 14

Mont. Admin. R. § 24.156.101 ...................................................... 50-51

Mont. Admin. R. § 24.159.101 ...................................................... 50-51

Mont. Admin. R. § 37.95.140 ............................................................ 59

**Constitutional Provisions**

Mont. Const. art. II, § 4 .................................................................... 45

U.S. Const. amend. XIV, § 1 ............................................................ 45

## I.   INTRODUCTION

The Montana Legislature may have been trying to ban COVID-19 immunization requirements when it passed MCA 49-2-312[1] in the spring of 2021; but the law the Governor signed had a much broader sweep—it banned *all* immunization requirements in health care settings, even routine workplace vaccine requirements such as MMR (measles-mumps-rubella) or Tdap (tetanus, diphtheria and pertussis).  The law went even further: banning *any* differential treatment on the basis of immunity status.  A doctor's office breaks the law if it responds to a measles patient by reassigning non-immune staff to duties elsewhere in the building.  A hospital breaks the law if it requires proof of immunity to pertussis from its Neonatal Intensive Care Unit ("NICU") staff, even though pertussis is fatal for premature infants.  Appellants even enforced the law against a conference for cancer survivors, concluding a "Zoom" option for non-immunized attendees was unlawful discrimination, akin to differential treatment on the basis of race or sex.

Because of these absurd results, and the grave risk to the integrity of the

---

[1] As noted by the district court, Montana Code Annotated § 49-2-313 solely exempts certain health care settings from the prohibitions in § 49-2-312.  As such, reference to MCA 49-2-312 includes reference to § 49-2-313, unless specifically noted.  Appellants refer to these sections as House Bill 702, though these laws were passed and codified.

1

health care system in Montana, Appellees challenged the new law, alleging the statute's poor design and dangerous effects conflicted with federal law and violated equal protection guarantees. Appellees represent a broad cross-section of Montanans who rely on the safe provision of health care: they include a hospital system, physicians' offices, the state medical association, a labor union for nurses, and individual immunocompromised patients.

Following a trial on the merits, the district court properly concluded MCA 49-2-312 was preempted by federal law and violates both state and federal equal protection guarantees. The district court's holdings follow, necessarily, from its factual findings, which were largely uncontroverted at trial and generally not challenged on appeal. As a result, the district court properly issued a targeted and limited injunction,[2] prohibiting enforcement of MCA 49-2-312 in health care settings in Montana.

First, the district court correctly held MCA 49-2-312 is preempted by the Americans with Disabilities Act ("ADA"). The ADA requires employers and

---

[2] Appellants do not contest on appeal that the elements necessary for an injunction were met. While Appellants included an issue as to whether the injunctive relief was appropriately tailored, they did not include any substantive argument regarding that issue. Dkt. 14 at 4. Therefore, such argument is deemed waived. *Nw. Acceptance Corp. v. Lynnwood Equip., Inc.*, 841 F.2d 918, 923-24 (9th Cir. 1988) (failure to present intelligible argument on an issue in an opening brief violates Fed. R. App. P. 28(a)(4), therefore such argument is waived).

public accommodations to provide reasonable accommodations to persons with disabilities. For Montanans whose disabilities render them vulnerable to vaccine-preventable disease (*e.g.*, cancer), the ADA requires Appellees to accommodate these persons by offering treatment only by immunized caregivers, or other differential treatment on the basis of caregiver immunity status. The district court properly determined MCA 49-2-312 directly conflicts with the ADA's mandate by prohibiting Appellees from any differential treatment of their staff on the basis of immunity status, thereby precluding them from meaningfully engaging in the interactive process required by the ADA.

Second, the district court properly held MCA 49-2-312 is preempted by the Occupational Safety and Health Act ("OSH Act") because it prevents employers in health care settings from complying with their obligations under the general duty clause. The district court found as a factual matter that vaccine-preventable diseases are an occupation-specific workplace hazard in health care settings, which are likely to cause death or serious injury. "[H]ealth care settings cannot comply with both the federal general duty clause to keep the workplace 'free from recognized hazards' and § 49-2-312, because the Montana statute removes an essential tool from the health care provider's toolbox to stop or minimize the risk of spreading vaccine-preventable disease." 1-ER-25. MCA 49-2-312 not only bans immunization requirements, it bans any form of differential treatment on the

3

basis of immunity status, which the district court found, as a factual matter, is essential to addressing infectious disease risk and outbreaks in health care settings. 1-ER-25.

Third, MCA 49-2-312 was also expressly preempted by the Centers for Medicare and Medicaid Services ("CMS") interim final rule, entitled "Medicare and Medicaid Programs; Omnibus COVID-19 Health Care Staff Vaccination" ("IFR"), which mandated the COVID-19 vaccine.

Finally, the district court correctly held MCA 49-2-312 violates the Equal Protection Clauses of the United States and Montana Constitutions. It is undisputed that physician offices, hospitals, nursing homes, long-term care facilities, and assisted living facilities are similarly situated in all relevant respects, yet physician offices and hospitals are not afforded equal treatment under Montana law. MCA 49-2-313 provides an exemption from the prohibitions of MCA 49-2-312 for nursing homes, long-term care facilities and assisted living facilities ("Exempted Facilities"), but does not exempt physician offices or hospitals. Moreover, MCA 49-2-312 provides a limited exception for "health care facilities," but singles out, and specifically excludes, physician offices from this exception. There is no rational basis for treating these entities differently and denying physician offices and hospitals (and their staff) equal protection under the law. Further, MCA 49-2-312 and 313 create impermissible classifications between

4

patients who seek care in these different facilities. Patients seeking care from an Exempted Facility are entitled to be treated by vaccinated workers; patients seeking care from a physician office or hospital are not. Appellants failed to articulate any legitimate interest for these distinctions and the district court properly held MCA 49-2-312 does not satisfy rational basis review. As a result, MCA 49-2-312 is unconstitutional.

## II.   JURISDICTIONAL STATEMENT

The jurisdictional statement provided in Appellants' Opening Brief is correct.

## III.   ISSUES PRESENTED

A.   Were the district court's findings of fact that health care settings cannot comply with both the ADA and MCA 49-2-312 clearly erroneous, and did the district court correctly hold, as a matter of law, that the obstacles created by MCA 49-2-312 for compliance with the ADA require the state statute to yield?

B.   Were the district court's findings of fact that health care settings cannot comply with both the OSH Act and MCA 49-2-312 clearly erroneous, and did the district court correctly hold as a matter of law that the contradiction between MCA 49-2-312 and the general duty clause requires the state statute to yield?

C.    Should this Court retroactively suspend the district court's enforcement of the CMS IFR regarding COVID-19 vaccination, and allow enforcement actions under MCA 49-2-312 to continue, for the period in which the IFR was in effect and expressly preempted the state law?

D.    Were the district court's findings of fact clearly erroneous, and conclusions of law incorrect, that MCA 49-2-312 violates state and federal equal protection guarantees?

## IV.    STATEMENT OF THE CASE

After extensive discovery and following a trial on the merits, Appellees conclusively established, and the district court found, that vaccines are a safe and effective means of reducing the infection and transmission risk of communicable diseases, and that immunity status matters with respect to an individual's ability to spread disease.  2-ER-291 at (hh); 2-ER-293-94 at (ww)-(ccc); 2-SER-420-21 at ¶¶ 10-11; 2-SER-441-42 at ¶ 6; 2-SER-476-77, 479 at ¶¶ 6-8, 15; 2-SER-483, 485-94, 517 at ¶¶ 5, 15-20, 26-28, 65; 2-SER-563-565; 2-SER-575-76, 584-85 at ¶¶ 6, 8, 24-25. [3]  *See also Biden v. Missouri*, 142 S. Ct. 647, 653 (2022).  Notwithstanding these undisputed facts, during the height of the COVID-19 pandemic, the Montana Legislature passed a statutory scheme making it unlawful for any employer in

---

[3] Based upon stipulation, expert reports served as each expert's direct testimony, subject to cross-examination at trial.  2-ER-321.

6

Montana to discriminate on the basis of vaccination or immunity status—codified as MCA 49-2-312. Notably, MCA 49-2-312 was not limited to COVID-19 and does not solely prohibit vaccine mandates. Instead, MCA 49-2-312 prohibited treating individuals differently, *in any manner,* based upon vaccine or immunity status related to *any disease*. 2-ER-292 at (oo)-(qq).

Knowledge of vaccination and/or immunity status is critical to infection prevention in health care settings—a fact unrefuted at trial. 2-ER-96:3-18; 1-SER-5:16-23; 1-SER-6:6-11; 1-SER-7:1-8:10; 1-SER-9:21-10:2; 1-SER-11:8-13:2; 1-SER-14:21-25; 1-SER-15:6-16:10; 1-SER-23:17-24:12; 1-SER-26:2-4; 1-SER-27:4-18; 1-SER-40:19-42:21; 1-SER-45:23-46:10; 1-SER-69:3-18; 1-SER-73:12-74:1; 1-SER-87:21-88:9; 1-SER-96:6-9; 1-SER-118:1-119:5; 2-SER-424-27 at ¶¶ 17-23; 2-SER-476-477 at ¶¶ 5-8; 2-SER-575, 584-85, 588-90, 593-94 at ¶¶ 6, 23-24, 33, 39, 40, 47-48; 3-SER-612 at 76:4-13. Despite vaccines being ubiquitous and standard-of-care patient and workplace safety measures in the American health care system, a fact recognized and espoused by Appellants' own expert, MCA 49-2-312 prohibits and criminalizes the use of vaccination or immunity status as patient and workplace safety measures in Montana. 2-SER-563-67; *Biden*, 142 S. Ct. at 653. The district court correctly determined MCA 49-2-312 harms public health by removing an essential tool—vaccines—from the health care community's fight against infectious diseases.

The majority of the relevant facts in this matter were, and are, unrefuted by Appellants. *See* 2-ER-289-294. It is uncontested that vulnerable and immunocompromised individuals seek health care from, and are employed with, Montana health care facilities, including Appellees Five Valleys, the Clinic, and Providence ("Institutional Appellees"). 2-ER-91:21-92:10; 2-ER-288-89 at (d)-(r); 2-ER-291 at (gg); 2-ER-293 at (vv); 1-SER-21:13-20; 1-SER-38:15-39:11; 1-SER-62:2-3, 21-24; 1-SER-64:16-65:25; 1-SER-93:7-18; 1-SER-96:3-19; 1-SER-101:9-14; 1-SER-145:25-146:5; 1-SER-147:3-149:13; 2-SER-443 at ¶¶ 9-10; 2-SER-477-79 at ¶¶ 10-12; 2-SER-589-91, 594 at ¶¶ 39, 42, 50. Further, there is no question vaccine-preventable diseases pose a risk of death and serious illness, particularly to immunocompromised individuals. 2-ER-64:2-17; 1-SER-19:10-12; 1-SER-22:4-14; 1-SER-38:15-39:11; 2-SER-423-25 at ¶¶ 16-17; 2-SER-441-43 at ¶¶ 6, 8-10; 2-SER-476-78 at ¶¶ 5-8, 10-11; 2-SER-494-95, 509 at ¶¶ 29, 55; 2-SER-575, 589-91 at ¶¶ 5-6, 39, 42. Certain immunocompromised individuals should not be exposed to unvaccinated individuals, including unvaccinated health care workers. 2-ER-64:2-7; 1-SER-20:10-22; 1-SER-47:22-48:11; 1-SER-96:25-97:19; 2-SER-446-447 at ¶ 17; 2-SER-476-77 at ¶¶ 5-8; 2-SER-509 at ¶ 55; 2-SER-590-92 at ¶¶ 42, 44. Health care workers are more likely to be exposed to infectious diseases than the general population and are more likely to come into contact with individuals who are at high-risk of contracting and being harmed by

8

infectious diseases.  2-ER-92:11-24; 1-SER-31:11-32:6; 1-SER-33:5-18; 1-SER-34:10-36:20; 1-SER-38:15-39:11; 1-SER-40:19-42:20; 1-SER-43:11-44:2; 1-SER-49:5-52:15; 1-SER-96:25-98:8; 2-SER-443 at ¶¶ 8-9; 2-SER-509 at ¶ 55.  Accordingly, vaccine-preventable diseases are a workplace hazard, specific to health care entities.  1-SER-31:11-32:6; 1-SER-33:5-18; 1-SER-34:10-36:20; 1-SER-38:15-39:11; 1-SER-40:19-42:20; 1-SER-43:11-44:2; 1-SER-49:5-52:15; 1-SER-96:25-98:8; 2-SER-443 at ¶¶ 8-10.

Immunocompromised patients and staff in Montana have requested to be treated only by vaccinated staff.  2-ER-71:7-13; 2-ER-77:20-78:1; 1-SER-98:11-100:7; 1-SER-101:9-23; 1-SER-146:2-10; 1-SER-147:3-149:19; 2-SER-479 at ¶ 14.  The district court correctly found health care providers need to know a caregiver's actual—not presumed—vaccination status to take meaningful steps to address situations where a worker or patient with a disability needs to limit exposure to non-immune individuals.  2-ER-96:3-18; 1-SER-9:21-10:2; 1-SER-11:8-13:2; 1-SER-23:17-24:12; 1-SER-26:2-4: 1-SER-27:4-18; 1-SER-40:19-42:20; 1-SER-45:23-46:10; 1-SER-69:3-18; 1-SER-73:12-74:1; 1-SER-89:3-22; 1-SER-90:18-20; 1-SER-118:11-119:5; 2-SER-444-46 at ¶¶ 12-16; 2-SER-478-79 at ¶¶ 11-12; 2-SER-567-68; 2-SER-588-90, 592 at ¶¶ 35, 39-40, 44.  In those situations where a patient or staff member with a disability can be harmed by an unvaccinated worker, staff must be treated differently based upon vaccination

status to allow those patients access to health care services. 2-ER-65:15-22; 2-ER-96:25-97:13; 1-SER-25:2-10; 1-SER-29:14-22; 1-SER-39:12-40:6; 1-SER-47:22-48:11; 1-SER-69:11-18; 2-SER-426-27 at ¶¶ 21-23; 2-SER-444, 446-48 at ¶¶ 12, 17-19; 2-SER-479 at ¶ 14; 2-SER-590 at ¶ 40. This may include reassigning the worker, requiring the worker to wear additional personal protective equipment ("PPE"), additional physical distancing precautions, or mandating vaccination, all of which are precluded by MCA 49-2-312. 2-ER-200-04; 1-SER-25:2-10; 1-SER-39:12-40:6; 1-SER-89:3-22; 1-SER-90:18-20; 2-SER-568. Not only are these factual findings sound under clear error review, they were unrefuted at trial and remain unchallenged on appeal.

There is no rational basis for treating Exempted Facilities different than hospitals and physician offices, as they are similarly situated in all relevant ways. 2-ER-93:4-95:12; 2-ER-99:1-24; 2-ER-118:2-119:10; 2-ER-291 at (cc)-(dd), (ff)-(gg); 1-SER-17:25-18:5; 1-SER-21:13-20; 1-SER-56:17-57:1; 1-SER-61:14-16; 1-SER-64:12-65:25; 1-SER-67:6-68:12; 1-SER-82:21-83:18; 1-SER-84:24-85:2; 1-SER-85:12-86:11; 1-SER-88:10-18; 1-SER-92:10-93:18; 1-SER-96:3-97:19; 1-SER-145:25-146:5; 1-SER-146:11-20; 2-SER-443-44, 448 at ¶¶ 11, 20-21; 2-SER-589, 593-94 at ¶¶ 39-48. As the district court found, these entities all provide similar care, to similarly situated patients, by similarly situated health care workers. In fact, they frequently treat the same patients with the same workers. 2-

10

ER-119:23-120:20; 1-SER-61:8-16; 1-SER-64:12-65:21; 1-SER-67:6-68:12; 1-SER-84:18-86:3; 1-SER-88:10-18. The ethical principles and duties to patients are unchanged based upon the location in which a provider is providing treatment. 2-SER-426-27 at ¶¶ 21-23; 2-SER-444, 448 at ¶¶ 12, 20-21; 2-SER-476-79 at ¶¶ 5-8, 12, 14; 2-SER-588-90, 592-94 at ¶¶ 34-36, 38, 40, 45, 48. Critically, all of these entities have the same interest in infection prevention, including preventing the spread of communicable diseases and protecting their patients and staff from harm. 2-ER-93:4-96:2; 2-ER-97:1-13; 1-SER-63:10-20; 1-SER-96:6-97:19; 1-SER-104:7-18; 1-SER-149:14-15; 1-SER-150:2-4; 2-SER-593-94 at ¶¶ 47-48.

Consequently, MCA 49-2-312 has led to absurd results. For example, MCA 49-2-312 allows assisted living facilities, which are not subject to CMS regulations, to comply with CMS regulations, while hospitals, which are subject to CMS regulations, cannot. 2-ER-291 at (cc)-(ee). The absurdity is further highlighted by the Montana Human Rights Bureau's[4] ("HRB") findings. In one case, the HRB found a retreat for cancer survivors violated MCA 49-2-312 because it limited in-person attendance for unvaccinated individuals, even though it offered them remote attendance. 1-SER-128:9-129:11; 2-SER-325-328. In others, the HRB found a prison is entitled to the health care facility exemption in MCA 49-2-

---

[4] The HRB is the entity that conducts investigations and determines whether there has been a violation of MCA 49-2-312. 1-SER-121:12-24.

11

312. 1-SER-130:7-131:20; 1-SER-132:20-133:2; 1-SER-228-2-SER-324. Yet, offices of private physicians, including pediatrician offices, are not. 1-SER-129:12-22.

Throughout the case and at trial, Appellants' defense focused almost exclusively on COVID-19 and COVID-19 vaccination mandates, ignoring the dangers presented by other vaccine-preventable diseases and the broad, prohibitive sweep of MCA 49-2-312. Appellants' own expert testified that for routine workplace vaccines such as MMR and Hepatitis B, the "clearly demonstrated reduction in transmission with high community vaccination rates requires more consideration than one's personal autonomy." 2-SER-567.

The district court's legal conclusions and holdings, which are the necessary and natural result of its factual findings, must be upheld. MCA 49-2-312, which undisputedly harms public health, must remain permanently enjoined from being enforced in Montana health care settings.

## V. SUMMARY OF THE ARGUMENT

A. The district court appropriately enjoined the enforcement of MCA 49-2-312, as it is preempted by Federal law. MCA 49-2-312 stands as an obstacle to the full purposes and objectives of the ADA, the OSH Act, and CMS regulations and is, therefore, preempted.

12

B.    MCA 49-2-312 was further appropriately enjoined because it violates the Equal Protection Clauses of the United States and Montana Constitutions.  The district court correctly determined MCA 49-2-312 unconstitutionally treats similarly situated classes differently with respect to their ability to utilize immunity and vaccination status in the fight against infectious diseases.  MCA 49-2-312 arbitrarily draws distinctions between Exempted Facilities, hospitals and other "health care facilities," and offices of private physicians, as well as the patients who seek care in each of these settings.  The disparate treatment of these classes caused by MCA 49-2-312 cannot withstand rational basis scrutiny and MCA 49-2-312 is unconstitutional as applied to health care settings.

## VI.    STANDARD OF REVIEW

The decision to grant a permanent injunction, as well as its scope and terms, are reviewed for abuse of discretion.  *Columbia Pictures Indus. v. Gary Fung*, 710 F.3d 1020, 1030 (9th Cir. 2013).  Any determination underlying the grant of an injunction is reviewed under the standard that applies to that determination.  *Edmo v. Corizon, Inc*., 935 F.3d 757, 784 (9th Cir. 2019); *Melendres v. Arpaio*, 784 F.3d 1254, 1260 (9th Cir. 2015) ("findings are reviewed for clear error and its legal conclusions are reviewed de novo").  "If the district court identified and applied the correct legal rule to the relief requested, we will reverse only if the court's decision resulted from a factual finding that was illogical, implausible, or without

support in inferences that may be drawn from the facts in the record." *Ariz. Dream Act Coal. v. Brewer*, 855 F.3d 957, 965 (9th Cir. 2017) (citations and internal quotation marks omitted).

Here, the district court's conclusions flow directly from its factual findings made after holding a trial on the merits. Such factual findings are reviewed for clear error. *See Saltarelli v. Bob Baker Group Med. Trust*, 35 F.3d 382, 384 (9th Cir. 1994) (after a bench trial, a district court's findings of fact are reviewed for clear error); *see also* Fed. R. Civ. P. 52(a)(6). "Clear error results from a factual finding that was illogical, implausible, or without support in inferences that may be drawn from the facts in the record." *Pom Wonderful L.L.C. v. Hubbard*, 775 F.3d 1118, 1123 (9th Cir. 2014) (citation and internal quotation omitted). "The clear error standard applies to those findings of fact the district court adopts from proposed findings submitted by the parties." *Saltarelli*, 35 F.3d at 384. "Clear error review also applies to the results of 'essentially factual' inquiries applying the law to the facts." *Id*. (citation omitted); *see also Serv. Emps. Int'l Union, etc. v. Fair Political Practices Com*., 955 F.2d 1312, 1317 n.7 (9th Cir. 1992) (whether a statute discriminates, even if treated as a mixed question of law and fact, presents an "essentially factual" question to which clear error review applies).

14

## VII.   ARGUMENT

**A.      The district court appropriately determined MCA 49-2-312 is preempted by Federal law.**

To give effect to the Supremacy Clause of the United States Constitution, a state law is preempted when it is impossible to comply with both the state statute and federal law, or where the state law "stands as an obstacle" to the accomplishment and execution of "the full purposes and objectives of Congress." *English v. Gen. Elec. Co.*, 496 U.S. 72, 79 (1990).  "'A state law also is pre-empted if it interferes with the methods by which the federal statute was designed to reach that goal.'"  *Gade v. Nat'l Solid Wastes Mgmt. Ass'n*, 505 U.S. 88, 103 (1992) (citation omitted).  Here, MCA 49-2-312 is preempted by the ADA, the OSH Act, and CMS Regulations.

### 1.      The district court correctly determined MCA 49-2-312 is preempted by the ADA.

Because MCA 49-2-312 conflicts with the congressional mandate of the ADA to prohibit disability discrimination by employers and public accommodations, it is preempted.  *See* 42 U.S.C. §§ 12112(a), 12182(a).  The district court did not make any clear error in determining the facts, which went largely uncontroverted at trial; nor did it err in applying the law.

15

a. **The district court correctly determined that, because MCA 49-2-312 interferes with the employer and public accommodation requirements of the ADA, it is preempted.**

The ADA "must be construed broadly in order to effectively implement the ADA's fundamental purpose of providing a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities." *McGary v. City of Portland*, 386 F.3d 1259, 1268 (9th Cir. 2004) (quotation marks and citation omitted); *Crowder v. Kitagawa*, 81 F.3d 1480, 1485 (9th Cir. 1996) ("when Congress has passed antidiscrimination laws such as the ADA which require reasonable modifications to public health and safety policies, it is incumbent upon the courts to insure that the mandate of federal law is achieved").

Under the ADA, an employer engages in unlawful discrimination if it fails to make "reasonable accommodations to the known physical … limitations of an otherwise qualified individual with a disability who is an applicant or employee[.]" 42 U.S.C. § 12112(b)(5)(A). "[E]mployer[s] must engage in an interactive process with the employee to determine the appropriate reasonable accommodation." *Zivkovic v. S. Cal Edison Co.*, 302 F.3d 1080, 1089 (9th Cir. 2002). If an employer is notified of a need for an accommodation, the interactive process is triggered. *Snapp v. United Transp. Union*, 889 F.3d 1088, 1095 (9th Cir. 2018). "The interactive process requires: (1) direct communication between the employer and employee to explore in good faith possible accommodations; (2) consideration of

16

the employee's request; and (3) offering an accommodation that is reasonable and effective." *Zivkovic*, 302 F.3d at 1089 (citations omitted).

The ADA similarly precludes public accommodations from denying individuals with disabilities "the full and equal enjoyment of [its] goods, services, facilities, privileges, advantages, or accommodations" and requires public accommodations to make "reasonable modifications" to their "policies, practices, or procedures" to afford such enjoyment to persons with disabilities. 42 U.S.C. §§ 12182(a), (b)(2)(A)(ii); 28 C.F.R. § 35.130(b)(7). Public accommodations include "health care provider(s)," "hospital(s)," and any "other service establishment." 42 U.S.C. § 12181(7)(f); *see also* 2-ER-292 at (mm).

The Equal Employment Opportunities Commission ("EEOC") has issued specific guidance that an immunocompromised individual's request for reasonable accommodations based upon an increased risk of contracting disease triggers the obligations under the ADA. 1-SER-138:6-139:9; 2-SER-332-407. But, in Montana, when immunocompromised individuals make such a request of their health care provider or employer to minimize exposure to unvaccinated individuals, MCA 49-2-312 stands as a direct obstacle to compliance with the ADA. Physician offices are unable even to engage in the interactive process and consider treating staff differently according to their immunity status, in order to reasonably accommodate immunocompromised patients or staff.

17

Following a full trial on the merits, the district court determined MCA 49-2-312 deprives health care providers of the ability to require workforce vaccination or even know the immunity status of their employees, thereby preventing a health care employer from considering potential reasonable accommodations when an employee with a disability requests to limit exposure to unvaccinated individuals. *See* 2-ER-292 at (pp)-(qq); 1-SER-128:9-129:11; 1-SER-140:24-141:14; 1-SER-143:17-24; 2-SER-325-28; 2-SER-409. When employees, due to their disabilities, request to work only around vaccinated staff, or limit exposure to nonvaccinated staff, the ADA clearly requires the employer to engage in an interactive process to reasonably accommodate these requests. 1-SER-138:2-140:9; 2-SER-336; 2-SER-380-81. But under MCA 49-2-312, an employer cannot consider such a request and, in fact, cannot even require another employee to disclose the employee's immunity status, so that it can consider appropriate potential accommodations. 1-SER-141:23-142:14. This prevents the employer from engaging in the interactive process to provide a reasonable accommodation to employees with disabilities. Accordingly, MCA 49-2-312 conflicts with, and stands as an obstacle to, the employer obligations under the ADA.

The district court also found that MCA 49-2-312 conflicts with the public accommodation obligations of the ADA. For the health and safety of particular patients with disabilities, some patients need to only be treated by vaccinated staff.

18

2-SER-427 at ¶¶ 22-23; 2-SER-444, 446-48 at ¶¶ 12, 17-19; 2-SER-478 at ¶ 11; 2-SER-589-90 at ¶¶ 39-42.  This requires health care providers to treat unvaccinated staff differently from vaccinated staff when patient care circumstances require. When an unvaccinated worker poses a risk to a disabled patient seeking care, that worker may need to wear additional PPE, be reassigned, be removed from the care environment, or otherwise be treated differently so that the vulnerable patient with a disability is accommodated.  2-ER-89:18-90:2; 1-SER-25:2-10; 1-SER-39:12-40:6; 1-SER-47:22-48:11.  Such conduct is categorically prohibited by MCA 49-2-312.  *See* 1-SER-125:17-127:14; 1-SER-128:9-129:11; 1-SER-140:24-141:14; 1-SER-143:17-24; 2-SER-325-28; 2-SER-329-331; 2-SER-408; 2-SER-409.  The district court properly found health care settings cannot comply with the contradictory mandates of state and federal law.  Refusing to accommodate a patient with a disability in this manner would result in the patient either being excluded from, or deprived of, "the full and equal enjoyment" of the health care services.  42 U.S.C. §§ 12182(a).  Yet, under MCA 49-2-312, physician offices and hospitals cannot accommodate such patients, as they cannot treat workers differently—in any way—based upon vaccination status.

The facts underlying the district court's ultimate determination that the ADA preempts MCA 49-2-312 were supported by substantial evidence at trial, and largely uncontroverted (or, in many cases, outright agreed to) by Appellants.

Appellants do not dispute the uncontroverted factual record establishing that hospitals and physician offices employ disabled employees and treat disabled patients as a public accommodation, triggering the employer and public accommodation obligations of the ADA. 2-ER-77:20-78:1; 2-ER-91:21-92:10; 2-ER-291 at (gg); 2-ER-293 at (vv); 3-ER-325-28, 333 at ¶¶ 3-20, 27, 62; 1-SER-62:2-3; 1-SER-62:21-63:9; 1-SER-65:16-21; 1-SER-98:11-100:7; 1-SER-101:9-18; 1-SER-145:25-146:10; 1-SER-147:3-12 ; *see also* 1-SER-136:14-23 (recognizing cancer is a disability). And, contrary to Appellants' baseless assertions now on appeal, at trial there were specific examples of employees and patients requesting to only be treated by vaccinated staff. 2-ER-77:20-78:1; 1-SER-98:11-100:7; 1-SER-101:9-23; 1-SER-145:25-146:10; 1-SER-147:3-149:9. The district court correctly determined these types of requests trigger the ADA's reasonable accommodation obligations, including the interactive process.

The district court appropriately found that MCA 49-2-312 requires healthcare entities to ignore or violate their mandate to reasonably accommodate patients and employees with disabilities—creating a direct, irreconcilable conflict with the ADA. *See Mary Jo C. v. N.Y. State & Local Ret. Sys.*, 707 F.3d 144, 164 (2d Cir. 2013) ("ADA preempts inconsistent state law when appropriate and necessary to effectuate a reasonable accommodation"). Accordingly, MCA 49-2-312 is preempted by the ADA.

   **b. Appellants' arguments misstate the facts, misconstrue the law, and do not support overturning the district court's decision.**

   In arguing the ADA should not preempt MCA 49-2-312, Appellants misconstrue, and in some instances blatantly misstate, the law and the facts. Appellants' arguments are insufficient to support reversal of the district court's findings of fact or its correct application of the law.

   Appellants have not established the district court made a clear error in determining the facts related to ADA preemption. In fact, the "facts" cited by Appellants are inconsistent with the record and must be rejected. Notably, Appellants' arguments rely heavily on their repeated, erroneous claim that no accommodation request was made related to vaccination status. Dkt. 14 at 17, 25, 30, 32, 35-36, 41, 43. This is demonstrably inaccurate.

   It is an uncontroverted fact that both patients and employees with disabilities have sought accommodations related to immunity status in Montana. 2-ER-71:7-21; 2-ER-77:20-78:1; 1-SER-98:11-100:7; 1-SER-101:9-23; 1-SER-146:3-149:9. Appellees provided numerous instances of patients requesting accommodations related to vaccination status. For example, Ms. Page testified that when she was seeking treatment for her cancer, she asked the staff at her oncology provider, Providence (an Appellee), if the people treating her were vaccinated. 2-ER-71:7-21; 1-SER-56:4-13. Ms. Page was informed that her provider could not tell her

21

that. 2-ER-71:7-10. Mr. Bodlovic, Providence's Chief Operating Officer, provided several instances of Providence patients asking to be treated by vaccinated staff, and explained they were unable to guarantee such treatment because of MCA 49-2-312. 1-SER-98:11-100:7. Five Valleys and the Clinic also provided examples of patients requesting the accommodation of being treated by vaccinated staff. 2-ER-77:20-78:1; 1-SER-146:4-10. Similarly, Appellants provided numerous examples of employees seeking accommodations based upon vaccination status. Mr. Bodlovic testified that Providence employs individuals with disabilities. 1-SER-101:9-11. He further testified:

> Q.    And has Providence had any employees request accommodations based upon the vaccination status of other staff?
>
> A.    Yes, we have.

1-SER-101:15-18. He testified that an employee left employment because Providence could not accommodate her request. 1-SER-101:9-23. Five Valleys and the Clinic also provided instances of employees requesting accommodations based upon vaccination status. 2-ER-77:20-78:1; 1-SER-146:3-149:13.

In ignoring or misrepresenting these facts, Appellants seemingly argue requests for accommodation are not valid unless they are in writing or contain some specific wording. That is simply not the law. *See Zivkovic*, 302 F.3d at 1089 ("An employee is not required to use any particular language when requesting an

22

accommodation[.]"); *see also Taylor v. Phoenixville Sch. Dist.*, 184 F.3d 296, 313 (3rd Cir. 1999) (relying on the EEOC's manual that requests for accommodation "do[] not have to be in writing, be made by the employee, or formally invoke the magic words 'reasonable accommodation[.]'") (citations omitted); *Shaikh v. Tex. A&M Univ. Coll. of Med.*, 739 Fed. App'x. 215, n.7 (5th Cir. 2018) (noting that a disabled individual does not have to formally apply for an accommodation). The district court correctly found requests for accommodations need not be written and verbal requests trigger the obligations under the ADA. 1-ER-20.

Appellants further misconstrue the law related to ADA preemption. Appellees need not prove that, in one particular case, an individual was discriminated against sufficient to sustain a private ADA claim. Rather, Appellees need only show, as they have, that MCA 49-2-312 conflicts with the ADA's requirements and objectives and that they have a particularized stake in that conflict. Plainly, Appellees—who are immunocompromised patients, health care employers, and health care employees—have a particularized stake in the contradictory mandates of state and federal law. Appellees have shown: (1) there are disabled individuals who seek health care and/or work in health care settings in Montana; (2) vaccination or immunity status is medically significant to some of those disabled individuals; (3) accommodation requests based upon vaccination status have been made, triggering the ADA; and (4) MCA 49-2-312 conflicts with

the ADA, as it impedes the reasonable accommodation process. 2-ER-71:7-21; 2-ER-77:20-78:1; 3-ER-326-28 at ¶¶ 10-20, 27; 1-SER-56:4-13; 1-SER-98:11-100:7; 1-SER-101:9-23; 1-SER-138:14-16; 1-SER-138:22-140:9; 1-SER-146:3-149:13; 2-SER-587-90, 592 at ¶¶ 32, 35, 39-40, 44.

Even more perplexing, Appellants appear to claim the only way to establish a prima facie claim of employment discrimination is for Appellees to prove that individuals sought and were denied employment. Dkt. 14 at 32. This ignores a whole host of other adverse employment actions (discipline, demotion, removal of job duties, reassignment, etc.) and ignores the reasonable accommodation and interactive process requirements of the ADA, which go far beyond denying employment. *See* 42 U.S.C. § 12112(b); *Snapp*, 889 F.3d at 1095.

Appellants also confusingly argue the ADA does not preempt MCA 49-2-312 because preemption is available as an affirmative defense to claims brought under MCA 49-2-312. Dkt. 14 at 37. Following this logic, no statute that provides a right of action would ever be prospectively enjoined based upon preemption because preemption would always be an available affirmative defense to a claim. This is not the law. *See Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 326 (2015) (citing *Ex parte Young,* 209 U.S. 123, 155-156 (1908)) ("if an individual claims federal law immunizes him from state regulation, the court may issue an injunction upon finding the state regulatory actions preempted").

24

Appellees need not await consummation of penalties under MCA 49-2-312, or an ADA discrimination claim, to obtain injunctive relief. *Valle del Sol Inc. v. Whiting*, 732 F.3d 1006, 1015 (9th Cir. 2013).

Moreover, Appellants' reliance on *E.T. v. Paxton*, 41 F.4th 709 (5th Cir. 2022), is misplaced. Initially, Appellants conflate standing with the underlying preemption claim. In *E.T.*, the Fifth Circuit held that the plaintiffs, who were seven students with disabilities, lacked standing because they did not demonstrate "injury in fact." 41 F.4th at 715-718. In this case, the district court appropriately determined Appellees had standing.[5] Unlike the Institutional Appellees, the individual plaintiffs in *E.T.* did not face civil or criminal liability based upon a state law that conflicted with the ADA. *See E.T.*, 41 F.4th 709. Here, civil and criminal liability are sufficient to satisfy injury in fact. Providence has faced at least five claims asserted under MCA 49-2-312. 1-SER-106:16-20. Further, *E.T.* is not binding authority and other courts have come to the opposite conclusion. *See Seaman v. Virginia*, 593 F. Supp. 3d 293, 310-11 (W.D. Va. 2022) (finding injury in fact satisfied by the significant risk of bodily harm to individuals with

---

[5] Appellants inappropriately attempt to reargue their standing arguments in a footnote. Dkt. 14 at 61. The district court directly addressed these arguments and Appellants have not appealed that Order. 3-ER-591-606. Regardless, as detailed in that Order and Appellees' briefing related to Appellants Second Motion to Dismiss, the district court appropriately found Appellees had standing. 3-ER-591-606; 3-SER-648-696.

disabilities if they contract COVID-19). *See also DOC v. New York*, 139 S. Ct. 2551, 2565 (2019) (noting future injuries may constitute injury in fact if "there is a substantial risk that the harm will occur").

Appellants' arguments related to Title III of the ADA and health care provider policies further miss the mark. Appellants appear to argue that because Appellees' policies do not require them to discriminate against immunocompromised individuals, they cannot establish MCA 49-2-312 conflicts with Title III of the ADA. Dkt. 14 at 34. Title III of the ADA, which relates to public accommodations, applies to more than just "policies." *See* 42 U.S.C. §§ 12182(a), (b)(2)(A)(ii); 28 C.F.R. § 35.130(b)(7). Under Title III, public accommodations are prohibited from denying individuals with disabilities the "full and equal enjoyment of … services," including health care services. 42 U.S.C. 12182(a). Appellants fail to comprehend that it is the prohibitions in MCA 49-2-312 that create a situation where health care providers either have to violate the ADA or MCA 49-2-312. MCA 49-2-312 precludes health care public accommodations from taking any action based upon the vaccination or immunity status of their staff. This includes any action to protect employees or the public from nonimmune staff, including engaging in the statutorily required interactive process. When a patient with a disability requests to be treated only by vaccinated staff, public accommodations are prohibited by MCA 49-2-312 from meaningfully

26

considering that request, which denies such individuals with the full and equal enjoyment of health care services. *Divne Allah v. Goord*, 405 F.Supp 2d 265, 280 (S.D.N.Y. 2005) (noting an ADA violation can occur even if a person is not wholly precluded from participating in a service. "[I]f [a person] is at risk of incurring serious injuries each time [the person] attempts to take advantage of outside medical attention, surely [the person] is being denied the *benefits* of this service."). *See also* 2-ER-80:25-81:24 (Ms. Page testifying she did not go to the Emergency Room for an asthma attack or get knee surgery, because she could not risk exposure to unvaccinated individuals). Thus, MCA 49-2-312 conflicts with Title III of the ADA.

Moreover, Appellants' argument related to Title III contains additional factually inaccurate statements. Prior to MCA 49-2-312, the Clinic did, in fact, track vaccination status and implemented different policies for nonvaccinated staff. 2-ER-78:22-79:3; 2-ER-89:18-90:2; 1-SER-68:13-69:18. And, prior to MCA 49-2-312, physician offices and hospitals were permitted to, and did, treat vaccinated and unvaccinated staff differently. 2-ER-89:18-90:2; 2-ER-194-204; 1-SER-39:12-40:6; 1-SER-47:22-48:11; 1-SER-69:11-18; 1-SER-89:3-22; 1-SER-90:18-20. Further, Ms. Page recounted specific instances where she was prevented from seeking health care because she could not be treated by vaccinated staff. 2-SER-58:19-59:24.

27

Appellants further confuse the issues by basing their arguments on the presumption that mandating vaccination is the only way MCA 49-2-312 is violated. MCA 49-2-312 prohibits far more than requiring vaccinations—it prohibits employers and public accommodations from taking *any action* based upon, or even *knowing*, the vaccination or immunity status of their staff. 1-SER-140:24-142:14. It denies health care employers and public accommodations the ability to consider potential accommodations, such as additional PPE, reassignment, removal, or otherwise treating a nonvaccinated or nonimmune individual differently, when necessary to limit an individual with a disability's exposure to unvaccinated individuals. The statute prohibits treating an individual differently *in any manner* based upon vaccination or immunity status, even when necessary to protect a vulnerable individual from disease.

Finally, Appellants' arguments regarding the purported limited exception at MCA 49-2-312(3)(b)[6] are nonsensical. Appellants appear to suggest the exception is intended to benefit individuals with disabilities and not dictate reasonable accommodations for the nonvaccinated/nonimmune individuals. Dkt. 14 at 44-48.

---

[6] This exception specifically does not apply to physician offices. Mont. Code Ann. §§ 49-2-312(3)(b); 50-5-101(26)(b). If physician offices have a disabled patient or employee who requests limited interactions with non-vaccinated individuals, physician offices are required to either violate the ADA or violate MCA 49-2-312.

This ignores the plain language of the exception and testimony from the Chief of the HRB, which is the agency tasked with enforcing MCA 49-2-312. *See* 1-SER-120:14-121:21. The exception specifically states the health care facility must "implement[] reasonable accommodation measures *for* employees, patients, visitors, and other persons *who are not vaccinated or not immune*[.]" MCA 49-2-312(3)(b)(ii) (emphasis added). The HRB Chief testified that the "reasonable accommodation measures" noted in the exception do not attach to the person with the disability. 1-SER-132:5-25; *see also* 2-SER-319. While the ADA requires the patient/employee with a disability be reasonably accommodated, MCA 49-2-312 requires the accommodation measures be provided to the unvaccinated/nonimmune employee posing the infection risk. Not only does the exception facially recognize the threat nonvaccinated people present to the safety and health of others, MCA 49-2-312 turns the reasonable accommodation process on its head—requiring accommodation of the non-disabled individual and prohibiting reasonable accommodation of the disabled individual.

MCA 49-2-312 stands as a direct obstacle to the accomplishment of the full objectives of the ADA—to prevent discrimination against individuals with disabilities. The district court did not err in its legal or factual determinations and appropriately held MCA 49-2-312 preempted by the ADA.

2.    **The district court correctly determined MCA 49-2-312 is preempted by the OSH Act.**

The general duty clause of the OSH Act preempts MCA 49-2-312. Vaccine-preventable diseases are a workplace hazard specific to health care settings. The unrefuted evidence at trial showed that to ensure a safe workplace, health care settings must be able to know—and act on—a person's immunity status. For example, nurses dispatched to a measles case must be vaccinated for measles, and those who cannot be immunized for measles must be reassigned to a shift elsewhere in the building. 1-SER-39:23-25; 1-SER-41:14-42:3. The evidence at trial showed these kinds of workplace safety practices, including workforce immunization requirements, are ubiquitous in American health care. MCA 49-2-312 forbids them.

The district court's conclusion that the Montana statute is preempted by federal law is reviewed for correctness. But the underlying determination that health care settings in Montana cannot comply with both MCA 49-2-312 and the OSH Act flows directly—inexorably—from a series of fact determinations, which are reviewed for clear error. *Yu v. Idaho State Univ.*, 15 F.4th 1236, 1241 (9th Cir. 2021). *See also Google LLC v. Oracle Am., Inc.*, 141 S. Ct. 1183, 1199 (2021) ("a reviewing court should try to break [a mixed question of law and fact] into its separate factual and legal parts, reviewing each according to the appropriate legal

30

standard. But when a question can be reduced no further, … 'the standard of review for a mixed question all depends—on whether answering it entails primarily legal or factual work.'").

"In the OSH Act, Congress endeavored 'to assure so far as possible every working man and woman in the Nation safe and healthful working conditions.'" *Gade*, 505 U.S. at 96 (quoting 29 U.S.C. § 651(b)). As this Court has explained,

> the Act consists of a general duty clause augmented in particular areas by specific regulations. The general duty clause provides "Each employer shall furnish to each of his employees employment and a place of employment which are free from recognized hazards . . ." 29 U.S.C. § 654(a)(1). "OSHA contemplates that the Secretary will promulgate specific safety standards to insure safe and healthful working conditions . . . The general duty clause applies when there are no specific standards." *Donovan v. Royal Logging Co.*, 645 F.2d 822, 829 (9th Cir. 1981) (citations omitted).

*Reich v. Mont. Sulphur & Chem. Co.*, 32 F.3d 440, 445 (9th Cir. 1994). The general duty clause remains the "minimum standard," whether or not specific OSHA regulations exist. *Id.*

It is well-established "[a] workplace condition violates the general duty clause when three conditions are met: '(1) the employer failed to render its workplace free of a hazard which was (2) recognized and (3) causing or likely to cause death or serious injury.'" 1-ER-23 (quoting *Donovan*, 645 F.2d at 829 (quotation marks omitted)). Whether a workplace condition meets these three requirements is a question of fact. *Donovan*, 645 F.2d at 829 (Secretary of Labor

31

satisfied "his burden of proof on these elements" and findings were supported by "[s]ubstantial evidence" in record).

Based on the evidence presented, the district court found vaccine-preventable diseases are a recognized hazard specific to health care workplaces, they cause or are likely to cause death or serious injury, and MCA 49-2-312 prevents health care workplaces from addressing the hazard. The district court specifically found:

- MCA 49-2-312 does not only apply to COVID-19, but "also regulates any employer covered conduct regarding *all* vaccine-preventable diseases"—in other words, it interferes with a NICU's ability to respond to a pertussis outbreak or a dialysis center's ability to respond to a measles exposure, as much as it affects either setting's ability to respond to COVID-19. 1-ER-24 (emphasis in original).

- "[T]he risk of vaccine-preventable disease is one that *is* specific to health care settings," 1-ER-25 (emphasis in original), "because the workplace risks of exposure to vaccine preventable diseases experienced by employees in health care settings are distinct from those experienced by . . . the public." 1-ER-26.

- "Plaintiffs proved that vaccine-preventable diseases constitute recognized hazards in the workplace." 1-ER-24.

32

- "[H]ealth care settings must know the vaccination or immunity status of employees 'to secure a safe workplace and protect patients.'" 1-ER-24 (citation omitted).

- "Health care settings use vaccinations, along with other measures to protect against the spread of vaccine-preventable diseases and to reduce the risk of this recognized hazard in the workplace." 1-ER-24.

- The "cumulative evidence Plaintiffs presented at trial demonstrates that vaccines are the single best way to" reduce the risk of this recognized hazard in the workplace and, "[c]onsequently, health care settings cannot comply with both the federal general duty clause to keep the workplace 'free from recognized hazards' and § 49-2-312, because the Montana statute removes an essential tool from the health care provider's toolbox to stop or minimize the risk of spreading vaccine-preventable disease." 1-ER-25.

- "As proved at trial, before § 49-2-312, health care settings use[d] vaccines in the workplace as a precaution to keep workers and patients safe from the risk of death or serious bodily injury because of vaccine-preventable disease exposure." 1-ER-25.

Substantial evidence supported the district court's findings. The district court specifically credited the testimony of Dr. Gregory Holzman, Appellants' own

33

former State Medical Officer who testified on behalf of Appellees.  1-ER-24.  *See also* 1-SER-31:11-32:6; 1-SER-33:5-18; 1-SER-34:10-36:20; 1-SER-38:15-39:11; 1-SER-40:19-42:20; 1-SER-43:11-44:2; 1-SER-49:5-52:15; 2-SER-443-48.  At trial, the CEO of the Montana Nurses Association Vicky Byrd, pediatric hospitalist Dr. Lauren Wilson, the Clinic, Five Valleys, and Providence all testified about the importance of immunity information, differential treatment on the basis of immunity information, and workforce immunization requirements in addressing the recognized hazard of vaccine-preventable diseases specific to health care workplaces.  2-ER-92:11-24; 2-ER-96:3-18; 2-ER-121:13-122:8; 1-SER-69:3-18; 1-SER-73:12-74:1; 1-SER-87:21-88:9; 1-SER-96:6-9; 1-SER-96:25-98:8; 1-SER-118:11-119:5; 1-SER-145:2-20; 2-SER-423-27 at ¶¶ 14-23.  This testimony went largely unrebutted.  Appellants' experts provided no opinions on workplace safety and submitted no testimony,[7] other than related to COVID-19, regarding the role of immunity information, differential treatment, or immunization requirements in health care workplaces. Accordingly, the district court concluded:

> [b]ecause vaccine-preventable diseases are recognized hazards and
> because § 49–2–312 significantly impacts the requisition of critical
> knowledge concerning risk assessment in those health care settings
> from protecting the workplace against such a hazard, the general duty

---

[7] As noted above, Appellants' own expert witness testified that for vaccines such as MMR and Hepatitis B, the "clearly demonstrated reduction in transmission with high community vaccination rates requires more consideration than one's personal autonomy."  2-SER-567.

clause of the Occupational Safety and Health Act preempts § 49–2–312.

1-ER-26.

Appellants' attacks on appeal are purely legal, internally contradictory, and misapprehend both federal preemption law and the OSH Act. And, crucially, Appellants do not seriously dispute the findings of fact that lead, necessarily, to the determination that health care settings in Montana *cannot* comply with both the OSH Act and MCA 49-2-312. The evidence at trial showed health care settings *must* be able to know—and act on—a person's immunity status to respond to the threat of vaccine-preventable diseases which is specific to health care workplaces. But, MCA 49-2-312 prohibits it.

Appellants' first argue that "Plaintiffs' OSHA [sic] claims fail because no specific federal standard applies." Dkt. 14 at 52. This Court has already considered, and flatly rejected, this argument. In *Reich*, a chemical manufacturer argued that OSHA's investigative and enforcement powers are "limited by the presence or absence of specific regulations"—that the OSH Act could only prohibit an unsafe working condition in the presence of an OSHA standard specifically on point. 32 F.3d at 444. The Court held this argument would essentially write the general duty clause out of the statute—focusing only on the existence of specific OSHA regulations "misconstrues the OSH Act as a series of unconnected stars in

35

space, in between which no standards govern and no investigation is proper. To the contrary, the Act consists of a general duty clause augmented in particular areas by specific regulations." *Id.* at 445. "OSHA's regulations may amplify and augment 29 U.S.C. § 654, but they do not displace OSHA's statutory obligation to continue to enforce the general duty clause as a minimum standard." *Id.* This Court concluded "[i]n light of the structure of the OSH Act, we view the absence of specific regulations . . . as of no special significance." *Id.* The same principles control in this case: the district court properly determined that MCA 49-2-312 creates unsafe working conductions under general duty clause analysis. That OSHA has not yet promulgated regulations in response to Montana's new statute is "of no special significance." *See Id.*[8]

In the same section, Appellants cite Justice Kennedy's concurrence in *Gade* to argue the OSH Act's savings clause "permits Montana to regulate in the area of civil rights by treating vaccination status as a protected class." Dkt. 14 at 54. Using the non-controlling concurrence in *Gade*, Appellants appear to argue two

---

[8] Appellants also appear to suggest, Dkt. 14 at 52, that the general duty clause should only apply in "unanticipated" situations where OSHA has not yet spoken through regulation. It is no surprise, however, that OSHA has not yet promulgated regulations on point: no other state in the country has yet to experiment with such dangerous legislation—outlawing commonplace, nationally-accepted workforce safety practices in health care settings. The hazard created by the state statute is, itself, "unanticipated."

contradictory points: first—an argument never clearly articulated before the district court—that MCA 49-2-312 is a bona fide health and safety regulation, and therefore not preempted by the OSH Act in the absence of specific OSHA regulations. Second, that MCA 49-2-312 is not preempted by the OSH Act because it is a civil rights statute, not really a health and safety regulation. Dkt. 14 at 55 ("As an antidiscrimination measure, HB702 is entirely out of the general duty clause's reach"). *Gade* defeats both arguments.

On the first, Appellants misread *Gade*. The case does not hold the general duty clause disappears in any area where OSHA has not issued specific regulations. Rather, states' abilities to issue bona fide workplace health and safety regulations are only saved from preemption if they are consistent with the general duty clause. Here, the district court specifically found MCA 49-2-312 makes health care workplaces *less safe*. 1-ER-4-44. Thus, even if MCA 49-2-312 were a bona fide workplace regulation (a position Appellants never took below and do not claim as the basis for the law related to their equal protection arguments), it would still be preempted by the OSH Act to the extent it makes recognized hazards *more* likely to cause serious bodily injury or death. States do not get a free pass to *degrade* workplace safety in areas where OSHA has not yet promulgated specific regulations.

On the second argument, *Gade* squarely rejects the proposition that

37

Appellants can escape preemption by simply labeling MCA 49-2-312 a civil rights law. The Supreme Court wrote,

> such a doctrine would enable state legislatures to nullify nearly all unwanted federal legislation by simply publishing a legislative committee report articulating some state interest or policy—other than frustration of the federal objective—that would be tangentially furthered by the proposed state law . . . Any state legislation which frustrates the full effectiveness of federal law is rendered invalid by the Supremacy Clause.

505 U.S. at 106 (internal quotations omitted) (quoting *Perez v. Campbell*, 402 U.S. 637, 651–652 (1971)). The Court concluded its "precedents leave no doubt that a dual impact state regulation cannot avoid OSH Act pre-emption simply because the regulation serves several objectives rather than one." *Id.* at 106. *Gade* does not save 49-2-312, no matter what label Appellants give the statute.

Appellants next argue the OSH Act cannot be preempted by MCA 49-2-312 because it cannot require irreversible medical procedures. Again, Appellants misconstrue the effects of MCA 49-2-312. As the district court made clear, MCA 49-2-312 does not merely prohibit vaccination mandates. Rather, it bans health care settings from knowing the immunity status of their workforces, and from any differential treatment on the basis of immunity status. It went unrebutted at trial— and is reflected in the district court's findings—that these tools (additional PPE, reassignment, removal, etc.), prohibited by MCA 49-2-312, are every bit as important in securing a workplace free from the threat of vaccine-preventable

38

diseases as workforce immunization requirements. And, despite the fear-mongering language around immunization requirements in Appellants' brief, the United States Supreme Court has recognized "[v]accination requirements are a common feature of the provision of healthcare in America: Healthcare workers around the country are ordinarily required to be vaccinated for diseases such as hepatitis B, influenza, and measles, mumps, and rubella." *Biden*, 142 S. Ct. at 653. These workforce vaccination requirements are a "common feature" for "[h]ealth care workers around the country" and "ordinarily required" because vaccine-preventable diseases are a recognized hazard specific to health care workplaces. *Id.*

Appellants next argue the general duty clause only applies where a recognized hazard can be completely, 100% prevented. The case law says no such thing. Defendants misleadingly cite *National Realty & Construction Company v. Occupational Safety & Health Review Commission*, 489 F.2d 1257, 1266 (D.C. Cir. 1973), for this proposition. But, as this Court has made clear, *National Realty* stands for the proposition that the OSH Act does not unreasonably require employers to contemplate "freak" accidents, and the touchstone for an employer's responsibility under the general duty clause is preventability. *Cal. Stevedore & Ballast Co. v. OSHRC*, 517 F.2d 986, 988 (9th Cir. 1975) (citing *Nat'l Realty*, 489 F.2d at 1265-67). "Congress clearly intended to require employers to eliminate all

39

foreseeable and preventable hazards." *Id.* (describing *Nat'l Realty*, 489 F.2d at 1265-67). It does not stand for the proposition that the general duty clause ceases to function anytime an unsafe workplace condition does, in fact, arise. There was substantial evidence at trial—uncontroverted by any testimony or evidence from Appellants—that vaccine-preventable diseases are, by definition, foreseeable and *preventable* in health care workplaces. Appellants also make the uncited, unsupported claim that "healthcare employers cannot . . . even meaningfully limit . . . the dangers associated with exposure to unvaccinated individuals through requiring staff vaccinations." Dkt. 14 at 57. The evidence at trial, including from Appellants' own expert, showed exactly the opposite—that health care settings successfully limit the danger of vaccine-preventable diseases through the collection of immunity information, disparate treatment on the basis of immunity information, and workforce immunization requirements. *See* 1-SER-31:2-32:6; 1-SER-33:8-18; 1-SER-35:19-36:10; 1-SER-37:14-16; 1-SER-39:12-40:6; 1-SER-41:11-42:20; 2-SER-441, 443-445 at ¶¶ 6, 8-13; 2-SER-567-68. Appellants' arguments on appeal do nothing to disturb the district court's well-supported factual findings.

Appellants finally argue "Plaintiffs failed to establish a prima facie case for an OSHA violation," because the general duty clause requires the Secretary to "'specify the specific steps an employer should have taken to avoid the citation and

demonstrate their feasibility.'"  Dkt. 14 at 56 (quoting *Donovan*, 645 F.2d at 829).

As with Appellants' similar "prima facie case" arguments under the ADA, there is

simply no requirement that a plaintiff in a preemption case have their own claim

under the federal statute they assert preempts a contrary state regulation.  In this

case, multiple different Appellees have a particularized stake in the conflict

between state and federal law: employers, like the Institutional Appellees, who

may be subject to enforcement under the OSH Act if they comply with state law,

and employees, like the Nurses, who are among those the OSH Act aims to protect

in their workplaces.  Nor does there need to be an active enforcement action by the

Secretary of Labor for there to be a preemption claim.  If there were, the "steps an

employer should have taken" to comply with the general duty clause are quite

clear—allow for the collection of accurate immunity information, differential

treatment on the basis of immunity information, and workforce immunization

requirements—just like every other state in the country does, and as health care

workplaces in Montana did prior to MCA 49-2-312.  2-ER-89:24-90:2; 2-ER-194-

204; 1-SER-68:13-69:10; 1-SER-89:3-90:3; 1-SER-90:18-20.

The district court's determination that the OSH Act preempts MCA 49-2-

312 in health care settings is a necessary conclusion based on the findings of fact

regarding the role immunity information, differential treatment, and workforce

immunization requirements play in safe health care workplaces in Montana.  These

41

practices are ubiquitous in American health care because they are necessary to free workplaces from the recognized hazard of vaccine-preventable diseases, which is specific to these settings. Employers cannot comply with their obligations under the general duty clause and MCA 49-2-312, so the district court properly concluded that the inconsistent state regulation yields.

### 3. The district court correctly determined MCA 49-2-312 was preempted by CMS Regulations, and properly fashioned this limited aspect of its injunction.

The district court correctly made permanent its previous preliminary injunction of MCA 49-2-312 based upon preemption by the CMS IFR. *See* 86 Fed. Reg. 61555 (Nov. 5, 2021); 1-ER-27. On March 18, 2022, the district court entered a limited, preliminary injunction against enforcement of MCA 49-2-312, but only as it related to the COVID-19 vaccine, and only as it applied to Montana health care facilities and individual practitioners and clinics subject to the IFR. The injunction was further limited "for so long as the Interim Final Rule remains in effect." 1-ER-27 (citing 3-SER-647). As such, this aspect of the injunction was expressly only effective while the IFR was in effect and would expire upon CMS's withdrawal of the rule. Following trial, the district court correctly made this limited preliminary injunction permanent, for so long as the IFR was in place.

The district court's legal basis for this limited injunction was, and is, legally sound, and the injunction itself was properly self-limited to the duration of the IFR.

42

The IFR unambiguously conflicted with MCA 49-2-312, requiring CMS-participating providers to ensure all staff are fully vaccinated for COVID-19, obtain proof of vaccination status, and treat individuals differently based on vaccination status. *See* 3-SER-63-38. The district court properly found MCA 49-62-312 was preempted by the CMS regulations.

Appellants do not substantively challenge the basis of the district court's injunction. Instead, Appellants argue this aspect of the district court's injunction became "moot" as of August 4, 2023, citing to the withdrawal of the IFR published at 88 Federal Register 36485 (June 5, 2023). Dkt. 14 at 59-60. The district court's injunction based upon the IFR automatically expired on its own terms when CMS's withdrawal of the rule became effective. Essentially, Appellants are asking this Court to vacate a ruling that, by its own terms, is no longer in effect, [9] which, ironically, makes Appellants' argument moot. The ruling itself is not "moot," as actions taken by CMS-covered facilities during the time the CMS IFR was in place, through its withdrawal, should still be protected from the prohibitions under MCA 49-2-312. Further, claims under MCA 49-2-312 asserted based upon actions taken during that time should continue to be enjoined, as MCA 49-2-312 was

---

[9] MCA 49-2-312 remains enjoined as to health care settings, as the injunction based upon preemption and Equal Protection guarantees was broader than the injunction based upon the IFR. 1-ER-43.

clearly preempted by the IFR during that time. Appellants are asking this Court to retroactively declare the district court's decision moot from the outset based upon the unknown (at that time) occurrence of a future event—withdrawal of the IFR in August of 2023. This is nonsensical and should be disregarded.

Moreover, Appellants' reliance on *Bd. of Trs. of the Glazing Health & Welfare Tr. v. Chambers*, 941 F.3d 1195 (9th Cir. 2019) is misplaced. There, this Court held the repeal of the statute being challenged renders an action challenging the statute moot. CMS's withdrawal of the IFR does not render this case moot, nor does it render the portion of the district court's self-limited and contingent injunction moot. CMS did not repeal its prior regulation. Rather, it withdrew it as part of its scaled response to the COVID-19 pandemic because they "believe[d] the risks targeted by the staff vaccination [requirement] have been largely addressed[.]" 88 Fed. Reg. 36485. Presumably, this was due, at least in part, to the IFR.

Likewise, *NASD Dispute Resolution, Inc. v. Judicial Council*, 488 F.3d 1065 (9th Cir. 2007), addressing application of vacatur when a case becomes moot on appeal, is not applicable. Vacatur is "an 'extraordinary remedy,' one only available to appellants who 'demonstrate … equitable entitlement' to it" and it furthers the public interest. *NASD*, 488 F.3d at 1068-69 (citations omitted). Here, Appellants have not established equitable entitlement or that vacatur is in the

44

public interest.  As noted above, this case is not "moot."  The district court's

injunction based on the CMS IFR is narrower than the ultimate injunction

fashioned, which is grounded in federal preemption and equal protection grounds.

As such, the expiration of CMS's IFR does not render the district court's

injunction moot and vacatur is inappropriate.

For these reasons, the district court's self-limited injunction based upon the

CMS IFR should not be vacated.

**B.     The district court correctly held MCA 49-2-312 is unconstitutional, as it violates the equal protection safeguards of the Montana and United States Constitutions.**

"[I]f a statute purporting to have been enacted to protect the public health,

the public morals or the public safety, has no real or substantial relation to those

objects, or is beyond all question, a plain, palpable invasion of rights secured by

the fundamental law, it is the duty of the courts to so adjudge, and thereby give

effect to the Constitution." *Jacobson v. Massachusetts*, 197 U.S. 11, 31 (1905)

(quotations omitted).

Both the Fourteenth Amendment and Article II, Section 4 of the Montana

Constitution prohibit a state from denying equal protection of the law.  Mont.

Const. art. II, § 4; U.S. Const. amend. XIV, § 1; *Gallinger v. Becerra*, 898 F.3d

1012, 1016 (9th Cir. 2018).  Montana's equal protection guarantee embodies "a

fundamental principle of fairness:  that the law must treat similarly-situated

45

individuals in a similar manner." *McDermott v. State Dep't of Corr.*, 29 P.3d 992, 998 (Mont. 2001). Similarly, the Equal Protection Clause of the United States Constitution "'is essentially a direction that all persons similarly situated should be treated alike.'" *Gallinger*, 898 F.3d at 1016 (citations omitted).

The district court properly concluded MCA 49-2-312 is unconstitutional based upon federal and state equal protection grounds utilizing a three-part analytical framework. The district court correctly: (1) identified the classes involved and determined they are similarly situated in all relevant respects; (2) determined the appropriate level of scrutiny; and (3) applied the level of scrutiny.[10] *Arneson v. State by & Through its Dep't of Admin., Teachers' Ret. Div.*, 864 P.2d 1245, 1250 (1993); *Hensley v. Mont. State Fund*, 477 P.3d 1065, 1073 (Mont. 2020); *Gallinger*, 898 F.3d at 1016.

The district court appropriately concluded MCA 49-2-312 arbitrarily carves Montana health care entities into three similarly situated categories, treating each differently with respect to the most crucial infection prevention tool health care providers have to prevent deadly, infectious diseases: (1) Exempted Facilities; (2)

---

[10] The District Court directly addressed and rejected Appellant's arguments regarding standing, conclusively and correctly determining Appellees had standing to challenge the statute at issue. *See* 1-ER-15-16. As noted above, to the extent Appellants attempt to challenge this finding through a footnote without analysis or authority, this argument should be rejected.

46

hospitals and other "health care facilities"; and (3) offices of private physicians. [11] The district court correctly determined that, in dividing out these classes of health care settings, the statute arbitrarily creates unequal, but similarly-situated classes among the patients who receive care from these different health care settings, as well as the employees who work in each type of care setting. The district court correctly held this disparate treatment does not satisfy rational basis scrutiny. 1-ER-31-36.

### 1. The district court correctly found these three classes are similarly situated.

The district court's factual finding that Exempted Facilities, hospitals, and offices of private physicians are similarly situated in all relevant respects was not clearly erroneous. The district court properly determined, based on the overwhelming weight of the evidence presented at trial, that all three classes of health care settings provide similar services, through the same types of providers, to the same types of patients. Thus, the district court properly found the classes were similarly situated in all relevant respects. *See Ariz. Dream Act Coal*, 855 F.3d at 966 (classes need only be similar in "relevant respects" as related to the

---

[11] MCA 49-2-312(3)(b) and 49-2-313 create these classifications. MCA 49-2-312(3)(b) creates a specific exception for "health care facilities," which do not include offices of private physicians (*see* Mont. Code Ann. § 50-5-101(26)(b)), and 49-2-313 creates an exemption for Exempted Facilities.

goals of the challenged law); *Harrison v. Kernan*, 971 F.3d 1069, 1075-76 (9th Cir. 2020) (male and female inmates, though housed separately, found to be similarly situated when evaluating prison regulation regarding ability to purchase personal property); *see also Hensley*, 477 P.3d at 1073. This finding was well-supported and went largely uncontroverted at trial.

The district court correctly determined all three of "these classes provide health care, in some cases the same type of care, and in some cases in the same building." 1-ER-29. The uncontroverted evidence at trial showed Providence operates a medical center in Polson, Montana that includes all three classes of health care settings, including a hospital, an Exempted Facility through its nursing home, and an outpatient physician clinic. 2-ER-99:2-24; 1-SER-84:2-85:2; 1-SER-85:12-86:11. Appellees further demonstrated that Providence staff, including nurses, CNAs, housekeepers, and security staff, are shared between the facilities. 1-SER-84:24-85:2; 1-SER-85:16-86:3. Additionally, the uncontroverted evidence established physicians at the Clinic and Five Valleys treat patients at both hospitals and offices of private physicians, sometimes in the same building. 1-SER-61:8-62:16; 1-SER-67:6-68:12; 1-SER-88:10-18; 1-SER-144:23-46:20. Moreover, the Nurses work in each type of health care setting, are exposed to the same vaccine-preventable diseases in each setting, and see the same types of patients with the same types of diseases in each setting. 2-ER-92:11-95:12.

48

The district court further correctly found hospitals, physician offices, and Exempted Facilities treat similarly situated patients, including patients with compromised immune systems and elderly patients. 1-ER-30; 2-ER-99:1-10; 2-ER-117:2-119:10; 2-ER-291 at (ff)-(gg); 1-SER-21:13-20: 1-SER-54:24-55:11; 1-SER-56:17-57:1; 1-SER-62:4-24; 1-SER-63:4-65:21; 1-SER-82:21-83:18; 1-SER-84:24-86:11; 1-SER-92:2-96:5; 1-SER-145:21-46:20; 2-SER-443 at ¶ 9; 2-SER-476-77 at ¶¶ 5, 10-11; 2-SER-588-90, 593-94 at ¶¶ 35, 39, 41, 48, 50. In fact, as noted by the district court, Appellees established that the same patient may be cared for and treated by the same health care provider in an Exempted Facility, physician office, and a hospital. 1-SER-20:23-21:20; 1-SER-62:4-65:21; 1-SER-86:4-11; 1-SER-92:2-96:5; 1-SER-145:25-146:20. Not only does this establish the three classes of facilities are similarly situated, it establishes that the patients treated at the three classes of facilities are similarly situated.

Furthermore, Appellees established all three care settings have the same interest in protecting their patients and staff from communicable diseases and utilizing all forms of infection control, including vaccination. Patients seeking care, particularly immunocompromised patients, all have the same interest in, and right to receive, safe and appropriate health care regardless of the type of facility providing the care. 1-ER-97:3-13; 1-SER-63:10-66:16; 1-SER-96:6-9; 1-SER-

103:7-20; 1-SER-104:7-18; 2-SER-584-85, 588-90, 593-94 at ¶¶ 23-24, 34-41, 47-48; 3-SER-612 at 76:4-13.

Appellants did not dispute this evidence at trial and do not contest these facts on appeal. Instead, as they did below, Appellants point only to the fact that the three classes of health care settings are subject to different statutory licensing schemes to establish they are not similarly situated. Dkt. 14 at 61-66. Critically, however, Appellants provide no analysis regarding how the minor regulatory differences create a difference in a *relevant* respect between the three classes. This is because the manner in which these settings are regulated from a licensing perspective is not a distinction relevant to the challenged statute. *Ariz. Dream Act Coal.*, 855 F.3d at 966; *Boardman v. Inslee*, 978 F.3d 1092, 1117 (9th Cir. 2020); *see also Nordlinger v. Hahn*, 505 U.S. 1, 10 (1992) ("The Equal Protection Clause does not forbid classifications. It simply keeps governmental decisionmakers from treating differently persons who are in all *relevant* respects alike" (emphasis added)). A distinction in licensure category is irrelevant to the Appellants' claimed basis for the statute, i.e. employee privacy. While Appellants point to the fact that offices of private physicians operate under a business license, they ignore the fact that the providers within those offices operate under the same regulatory and ethical obligations as providers in hospitals or Exempted Facilities. *See* Mont. Code Ann. §§ 37-3-101, et seq. (practice of medicine statutes); 37-8-101, et seq.

50

(nursing statutes); 37-20-101, et seq. (physician assistant statutes); Mont. Admin. R. §§ 24.156.101, et seq. (physician regulations); 24.159.101, et seq. (nursing regulations); *see also* 2-SER-588-89 at ¶¶ 34-36, 38. The fact that hospitals, Exempted Facilities, and physician offices have different licensing categorization does not change the established fact that these facilities treat the same types of patients, in similar settings, through the same types of providers and staff.

The district court correctly determined the classifications drawn by MCA 49-2-312 are similarly situated in all relevant respects, yet the statute provides substantively unequal treatment to hospitals, physician offices, and the patients and providers who receive and provide care in these settings. Appellants have failed to establish that the district court's findings were clearly erroneous.

### 2. MCA 49-2-312 fails rational basis scrutiny because its disparate classifications have no relationship whatsoever to the purported state interest.

The district court properly concluded the disparate treatment of the classifications drawn by MCA 49-2-312 fails even under rational basis scrutiny. MCA 49-2-312's disparate treatment of physician offices and hospitals, and their patients and providers, is not "'rationally related to a legitimate state interest.'" *Ariz. Dream Act Coal.*, 855 F.3d at 969 (citation omitted). The Appellants' claimed bases for the law are, on their own, arbitrary and irrational, and the statute

itself is not rationally related to the stated interest or the classifications drawn by the statute.

The district court properly identified, and it is undisputed that, these similarly situated health care settings, the patients who receive care in each, and the nurses who work in each, are substantively treated differently under MCA 49-2-312 in numerous respects. First, the statute discriminates against physician offices and "health care facilities" as compared to the Exempted Facilities by operation of MCA 49-2-313. Exempted Facilities can follow Centers for Disease Control and Prevention ("CDC") and CMS guidance and regulations to protect their patients and staff, notwithstanding the prohibitions of MCA 49-2-312.[12] 11-SER-133:24-135:3; 1-SER-224-27. However, physician offices (providing both primary and specialty care to those same patients) and hospitals (providing acute inpatient, outpatient, emergency, and surgical treatment to those same patients) may not. Mont. Code Ann. §§ 49-2-312-13. Because the CDC and CMS both emphatically recognize and recommend vaccines in all health care settings, Exempted Facilities may reasonably mandate staff vaccination for the safety of

---

[12] Appellants incorrectly argue in a footnote this differential treatment will be moot upon withdrawal of the CMS Interim Final Rule. Dkt. 14 at 74. However, the Exempted Facilities are not treated differently merely because they permitted to comply with CMS regulations. They are also treated differently because they are allowed to comply with both CMS and CDC guidance, whereas physician's offices and hospitals are not. Mont. Code Ann. §§ 49-2-312-13.

both their patients and employees, obtain immunity status information, or treat employees according to their immunity status. 1-SER-151-218; 2-SER-490, 494-95 at ¶¶ 22, 29; *see also Biden*, 142 S. Ct. 647; and 2-ER-77:12-16; 1-SER-104:7-18; 1-SER-150:2-4 (testimony that Institutional Appellees all follow CDC guidance). Yet, under MCA 49-2-312, physician offices and hospitals may not—limiting their ability to provide a safe environment and comply with CDC and CMS guidance and recommendations. Instead, physician offices and hospitals are subjected to civil and criminal liability for what would otherwise be industry standard and, in some cases, medically, legally, and ethically required action. *See Biden*, 142 S. Ct. at 652 ("ensuring that providers take steps to avoid transmitting a dangerous virus to their patients is consistent with the fundamental principle of the medical profession: first, do no harm. It would be the 'very opposite of efficient and effective administration for a facility that is supposed to make people well to make them sick[.]'" (citations omitted)).

Second, the statute discriminates against physician offices as compared to "health care facilities," as physician offices are excluded from the exception in MCA 49-2-312(3)(b). Physician offices provide a wide array of crucial primary and specialty care to high-risk individuals. 2-ER-117:2-119:16; 1-SER-62:4-13. Yet, under MCA 49-2-312, physician offices are deprived of the ability to take *any* action that would treat an unvaccinated staff member differently than a vaccinated

staff member, even when such action is required to protect people from communicable diseases. "Health care facilities" are allowed, in certain limited circumstances, to treat employees differently based upon vaccination status if they implement "reasonable accommodation measures" to the nonvaccinated, but physician offices are not.

Third, MCA 49-2-312 and 49-2-313 arbitrarily create and disparately treat classes of patients, allowing patients receiving care in Exempted Facilities to receive care in a different and safer manner, as compared with patients receiving care in a hospital or physician office. Patients in an Exempted Facility may be treated in an environment that requires vaccination or otherwise uses the knowledge of staff's immunity status in a manner that protects patients. Patients seeking treatment and care from a hospital or physician office are precluded from benefiting from these precautions.

Fundamentally, MCA 49-2-312 is not rationally related to a legitimate state interest because it is antithetical to the proper exercise of a state's police power—elevating individual rights over the public good. The Supreme Court established a state's police power may "embrace [] such reasonable regulations established directly by legislative enactment *as will protect the public health and safety*." *Jacobson*, 197 U.S. at 22 (emphasis added). "As *Jacobson* reveals, the right to refuse vaccination is not deeply rooted in this nation's history." *Johnson v. Brown*,

567 F. Supp. 3d 1230, 1250-51 (D. Or. 2021); *see Zucht v. King*, 260 U.S. 174, 176 (1922) (it is "settled that it is within the police power of a State to provide for compulsory vaccination"). The district court properly found that rather than promote public safety, MCA 49-2-312 harms public health in the name of individual privacy. 1-ER-4-44; 3-SER-612 at 76:4-13. As such, MCA 49-2-312 is, as a matter of law, an improper exercise of police power and unsupported by a rational basis.

Appellants' repeatedly argued basis for MCA 49-2-312, to prevent discrimination based on actual or perceived vaccination and immunity status, is arbitrary and illogical. As the district court properly emphasized, MCA 49-2-312 is not a public health statute. It is, in fact, the opposite, as it directly harms public health in the name of individual privacy. Creating a wholly novel protected class based on the non-immutable characteristic of vaccination/immunity status interferes with compliance with anti-discrimination laws, as described above. Accordingly, it is not rationally related to preventing discrimination.

Further, the district court correctly determined the arbitrary classifications drawn by MCA 49-2-312 are not rationally related to protecting the privacy of employee medical information. An employee of an Exempted Facility has the same interest in medical privacy as an employee of a hospital or physician office. As shown at trial, one individual employee can work in all three settings. *See, e.g.,*

55

1-SER-84:24-85:2; 1-SER-85:12-86:3. There is no rational or legitimate argument that employees have a greater right to privacy or to pursue employment in Exempted Facilities than in hospitals and physician offices. *Mont. Cannabis Indus. Ass'n v. State*, 286 P.3d 1161, 1166 (Mont. 2012) (the right to pursue employment does not equate to a right to pursue a particular employment or one free of regulation). There is no rational relationship between Appellants' stated interest in privacy and MCA 49-2-312's impact on different health care settings, patients, and employees. *See Merrifiend v. Lockyer*, 547 F.3d 978, 988 (9th Cir. 2008) (no rational basis for singling out three types of vertebrae pests for pest control licensing purposes); *Silveira v. Lockyer*, 312 F.3d 1052, 1087-88 (9th Cir. 2002) (no rational basis for the retired officer exception of the AWCA because it did not further the interest of enacting restrictions on assault weapons and was not otherwise connected to a legitimate state interest); *Christian Heritage Acad. v. Okla. Secondary Sch. Activities Ass'n*, 483 F.3d 1025, 1033 (10th Cir. 2007) (no rational basis for treating nonpublic schools harsher than public schools); *see also Ariz. Dream Act Coal.*, 855 F.3d at 969-970.

Similarly, ensuring Exempted Facilities could comply with CMS regulations or CDC guidance does not provide a rational basis for the distinctions created. *See* Dkt. 14 at 72-73; 1-SER-219-223. This basis is irrational because hospitals, which are treated differently from Exempted Facilities, are also subject to CMS

56

regulations and—before MCA 49-2-312—adhered to CDC infection control guidance. 1-SER-103:8-23; 1-SER-104:7-18; 1-SER-106:3-13; 2-SER-480 at ¶ 17; 3-SER-607-609 at 52:17-20, 56:25-57:16. Moreover, assisted living facilities—one of the Exempted Facilities—are *not* CMS-certified facilities and are *not* required to follow CMS Conditions of Participation. 2-SER-410; 3-SER-603 at 36:5-23; 3-SER-614 at 83:14-84:7. Thus, the distinctions are, in and of themselves, arbitrary and irrational, as MCA 49-2-312 does not differentiate between entities based upon CMS participation. Therefore, compliance with CMS regulations or adherence to CDC guidance cannot serve as a rational basis for the classifications drawn.

Moreover, Appellants' argument that the core services and populations served by these health care entities are "generally different" is irrational and unmoored from the facts. As correctly determined by the district court, MCA 49-2-312 is not a public health law, as there is no basis in public health for removing the ability to utilize vaccination and immunity status from certain health care providers. The fact that Appellees did not provide a number or exact percentage of high-risk patients treated by offices of private physicians does not somehow establish the classifications in MCA 49-2-312 are rational. Dkt. 14 at 75. The undisputed facts established that all three classes treat the same types of high-risk patients and, on occasion, may even treat the exact same patient. 2-ER-117:22-

119:10; 1-SER-62:4-65:21; 1-SER-91:2-96:5; 1-SER-96:25-98:8; 1-SER-145:25-146:20; 2-SER-476-78 at ¶¶ 5, 10; 2-SER-593-94 at ¶ 48.  It was further undisputed that hospitals provide a higher level of care, meaning they treat more complex and higher risk patients, than Exempted facilities.  1-SER-96:3-5; 1-SER-97:20-98:8. Accordingly, this purported basis is also irrational.

When the stated interest fails to have a logical connection to classifications and impact of a statute, the statute fails rational basis scrutiny.  The Supreme Court's holding in *City of Cleburn* is directly analogous.  There, a city ordinance required group homes for mentally disabled residents to obtain a special permit to operate, while other businesses and group homes did not.  *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 447 (1985).  Noting the ordinance did not apply to "apartment houses, multiple dwellings, boarding and lodging houses, fraternity or sorority houses, dormitories, apartment hotels, hospitals, sanitariums, nursing homes for convalescents or the aged (other than for the insane or feebleminded or alcoholics or drug addicts), private clubs or fraternal orders, and other specified uses[,]" the Court held the stated interests of the ordinance—protecting the proposed residents from harassment from nearby junior high school students and the fact the structure would be located on "a five hundred year flood plain"—bore no relation to the unequal treatment of the particular type of group home, as these interests would apply equally to all other types of facilities or

58

buildings. *City of Cleburne*, 473 U.S. at 449. The Court rejected the argument that the ordinance was aimed at avoiding congestion of the streets, noting the concerns "obviously fail to explain why apartment houses, fraternity and sorority houses, hospitals and the like, may freely locate in the area without a permit." *Id*. at 450. Similarly here, the stated interests bear no logical connection to the classifications drawn by the statute. *See Romer v. Evans*, 517 U.S. 620 (1996) (striking down, under rational basis review, Colorado constitutional amendment that prohibited any state measure aimed at preventing discrimination based on sexual orientation, finding the law's stated basis wholly unconnected to its sheer breadth and discriminatory impact).

Additionally, MCA 49-2-312 stands at odds with medical providers' professional and ethical standards of care when treating vulnerable patients. 1-SER-478-79 at ¶ 12; 1-SER-588-89 at ¶¶ 34-36, 38. Whatever the stated intent, such intent cannot constitute a rational basis if it forces physicians to violate their Hippocratic oath and national standards of care. *See Biden*, 142 S. Ct. at 653. Moreover, none of the stated bases can be rational when other Montana statutes specifically require vaccination in schools and daycares. Mont. Code Ann. § 20-5-403(1); Mont. Admin. R. 37.95.140. There is no rational basis to prohibit a pediatrician's office or a hospital from mandating the MMR, Tdap, varicella, polio, and Hib vaccines to protect pediatric patients, when Montana law separately

*requires* schools and daycares to mandate those exact same vaccines to protect children.  Appellants cannot find a supportable public interest for a statute that is directly antagonistic to public health and inconsistent with other Montana vaccination requirements.

MCA 49-2-312's disparate treatment of health care entities and the patients seeking care from those entities is not rationally related to any state interest.  MCA 49-2-312 arbitrarily determines which types of health care entities can comply with public health standards and prevent the spread of infectious diseases.  Accordingly, the district court appropriately held this statutory scheme unconstitutional under state and federal equal protection guarantees.

## VIII.  CONCLUSION

The district court should be affirmed.

DATED this 15th day of September, 2023.

/s/  Kathryn S. Mahe
Attorneys for Plaintiffs – Appellees


/s/  Justin K. Cole
Attorneys for Plaintiffs – Appellees


/s/  Raph Graybill
Attorneys for Plaintiff – Intervenors

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

## Form 17. Statement of Related Cases Pursuant to Circuit Rule 28-2.6

*Instructions for this form:* http://www.ca9.uscourts.gov/forms/form17instructions.pdf

**9th Cir. Case Number(s)** | 23-35014

The undersigned attorney or self-represented party states the following:

(•) I am unaware of any related cases currently pending in this court.

( ) I am unaware of any related cases currently pending in this court other than the case(s) identified in the initial brief(s) filed by the other party or parties.

( ) I am aware of one or more related cases currently pending in this court. The case number and name of each related case and its relationship to this case are:

| |
| --- |
| |

**Signature** | s/ Kathryn S. Mahe     **Date** | 9/15/2023

*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at* forms@ca9.uscourts.gov

**Form 17**      *New 12/01/2018*

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

## Form 8. Certificate of Compliance for Briefs

*Instructions for this form:* http://www.ca9.uscourts.gov/forms/form08instructions.pdf

**9th Cir. Case Number(s)** | 23-35014

I am the attorney or self-represented party.

**This brief contains** | 12,425 | **words,** including | 0 | words

manually counted in any visual images, and excluding the items exempted by FRAP

32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

◉ complies with the word limit of Cir. R. 32-1.

◯ is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

◯ is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

◯ is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

◯ complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:
- ☐ it is a joint brief submitted by separately represented parties.
- ☐ a party or parties are filing a single brief in response to multiple briefs.
- ☐ a party or parties are filing a single brief in response to a longer joint brief.

◯ complies with the length limit designated by court order dated [           ].

◯ is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** | s/ Kathryn S. Mahe | **Date** | 9/15/2023

*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at* forms@ca9.uscourts.gov

**Form 8**     *Rev. 12/01/22*

# ADDENDUM

# UNITED STATES CONSTITUTION

<u>U.S. Const. art. VI, cl. 2</u>

This Constitution, and the Laws of the United States which shall be made in Pursuance thereof; and all Treaties made, or which shall be made, under the Authority of the United States, shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding.

<u>U.S. Const. amend. XIV, § 1</u>

Sec. 1. [Citizens of the United States.] All persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the State wherein they reside. No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws.

# FEDERAL STATUTES

29 U.S.C. § 654

(a) Each employer—

(1) shall furnish to each of his employees employment and a place of employment which are free from recognized hazards that are causing or are likely to cause death or serious physical harm to his employees;

(2) shall comply with occupational safety and health standards promulgated under this Act.

(b) Each employee shall comply with occupational safety and health standards and all rules, regulations, and orders issued pursuant to this Act which are applicable to his own actions and conduct.


42 U.S.C. § 12112

(a) General rule. No covered entity shall discriminate against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment.

(b) Construction. As used in subsection (a), the term "discriminate against a qualified individual on the basis of disability" includes—

(1) limiting, segregating, or classifying a job applicant or employee in a way that adversely affects the opportunities or status of such applicant or employee because of the disability of such applicant or employee;

(2) participating in a contractual or other arrangement or relationship that has the effect of subjecting a covered entity's qualified applicant or employee with a disability to the discrimination prohibited by this title (such relationship includes a relationship with an employment or referral agency, labor union, an organization providing fringe benefits to an employee of the covered entity, or an organization providing training and apprenticeship programs);

(3) utilizing standards, criteria, or methods of administration—

(A) that have the effect of discrimination on the basis of disability; or

(B) that perpetuate the discrimination of others who are subject to common administrative control;

(4) excluding or otherwise denying equal jobs or benefits to a qualified individual because of the known disability of an individual with whom the qualified individual is known to have a relationship or association;

(5)

    (A) not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee, unless such covered entity can demonstrate that the accommodation would impose an undue hardship on the operation of the business of such covered entity; or

    (B) denying employment opportunities to a job applicant or employee who is an otherwise qualified individual with a disability, if such denial is based on the need of such covered entity to make reasonable accommodation to the physical or mental impairments of the employee or applicant;

(6) using qualification standards, employment tests or other selection criteria that screen out or tend to screen out an individual with a disability or a class of individuals with disabilities unless the standard, test or other selection criteria, as used by the covered entity, is shown to be job-related for the position in question and is consistent with business necessity; and

(7) failing to select and administer tests concerning employment in the most effective manner to ensure that, when such test is administered to a job applicant or employee who has a disability that impairs sensory, manual, or speaking skills, such test results accurately reflect the skills, aptitude, or whatever other factor of such applicant or employee that such test purports to measure, rather than reflecting the impaired sensory, manual, or speaking skills of such employee or applicant (except where such skills are the factors that the test purports to measure).

(c) Covered entities in foreign countries.

    (1) In general. It shall not be unlawful under this section for a covered entity to take any action that constitutes discrimination under this section with respect to an employee in a workplace in a foreign country if compliance with this section would cause such covered entity to violate the law of the foreign country in which such workplace is located.

    (2) Control of corporation.

        (A) Presumption. If an employer controls a corporation whose place of incorporation is a foreign country, any practice that constitutes

discrimination under this section and is engaged in by such corporation shall be presumed to be engaged in by such employer.

(B) Exception. This section shall not apply with respect to the foreign operations of an employer that is a foreign person not controlled by an American employer.

(C) Determination. For purposes of this paragraph, the determination of whether an employer controls a corporation shall be based on—

(i) the interrelation of operations;

(ii) the common management;

(iii) the centralized control of labor relations; and

(iv) the common ownership or financial control,

of the employer and the corporation.

(d) Medical examinations and inquiries.

(1) In general. The prohibition against discrimination as referred to in subsection (a) shall include medical examinations and inquiries.

(2) Preemployment.

(A) Prohibited examination or inquiry. Except as provided in paragraph (3), a covered entity shall not conduct a medical examination or make inquiries of a job applicant as to whether such applicant is an individual with a disability or as to the nature or severity of such disability.

(B) Acceptable inquiry. A covered entity may make preemployment inquiries into the ability of an applicant to perform job-related functions.

(3) Employment entrance examination. A covered entity may require a medical examination after an offer of employment has been made to a job applicant and prior to the commencement of the employment duties of such applicant, and may condition an offer of employment on the results of such examination, if—

(A) all entering employees are subjected to such an examination regardless of disability;

(B) information obtained regarding the medical condition or history of the applicant is collected and maintained on separate forms and in separate medical files and is treated as a confidential medical record, except that—

4

(i) supervisors and managers may be informed regarding necessary restrictions on the work or duties of the employee and necessary accommodations;

(ii) first aid and safety personnel may be informed, when appropriate, if the disability might require emergency treatment; and

(iii) government officials investigating compliance with this Act shall be provided relevant information on request; and

(C) the results of such examination are used only in accordance with this title.

(4) Examination and inquiry.

(A) Prohibited examinations and inquiries. A covered entity shall not require a medical examination and shall not make inquiries of an employee as to whether such employee is an individual with a disability or as to the nature or severity of the disability, unless such examination or inquiry is shown to be job-related and consistent with business necessity.

(B) Acceptable examinations and inquiries. A covered entity may conduct voluntary medical examinations, including voluntary medical histories, which are part of an employee health program available to employees at that work site. A covered entity may make inquiries into the ability of an employee to perform job-related functions.

(C) Requirement. Information obtained under subparagraph (B) regarding the medical condition or history of any employee are subject to the requirements of subparagraphs (B) and (C) of paragraph (3).

42 U.S.C. § 12181

As used in this title [42 USCS §§ 12181 et seq.]:

(1) Commerce. The term "commerce" means travel, trade, traffic, commerce, transportation, or communication—

(A) among the several States;

(B) between any foreign country or any territory or possession and any State; or

5

(C) between points in the same State but through another State or foreign country.

(2) Commercial facilities. The term "commercial facilities" means facilities—

(A) that are intended for nonresidential use; and

(B) whose operations will affect commerce.

Such term shall not include railroad locomotives, railroad freight cars, railroad cabooses, railroad cars described in section 242 [42 USCS § 12162] or covered under this title [42 USCS §§ 12181 et seq.], railroad rights-of-way, or facilities that are covered or expressly exempted from coverage under the Fair Housing Act of 1968 (42 U.S.C. 3601 et seq.).

(3) Demand responsive system. The term "demand responsive system" means any system of providing transportation of individuals by a vehicle, other than a system which is a fixed route system.

(4) Fixed route system. The term "fixed route system" means a system of providing transportation of individuals (other than by aircraft) on which a vehicle is operated along a prescribed route according to a fixed schedule.

(5) Over-the-road bus. The term "over-the-road bus" means a bus characterized by an elevated passenger deck located over a baggage compartment.

(6) Private entity. The term "private entity" means any entity other than a public entity (as defined in section 201(1) [42 USCS § 12131(1)].

(7) Public accommodation. The following private entities are considered public accommodations for purposes of this title [42 USCS §§ 12181 et seq.], if the operations of such entities affect commerce—

(A) an inn, hotel, motel, or other place of lodging, except for an establishment located within a building that contains not more than five rooms for rent or hire and that is actually occupied by the proprietor of such establishment as the residence of such proprietor;

(B) a restaurant, bar, or other establishment serving food or drink;

(C) a motion picture house, theater, concert hall, stadium, or other place of exhibition or entertainment;

(D) an auditorium, convention center, lecture hall, or other place of public gathering;

6

(E) a bakery, grocery store, clothing store, hardware store, shopping center, or other sales or rental establishment;

(F) a laundromat, dry-cleaner, bank, barber shop, beauty shop, travel service, shoe repair service, funeral parlor, gas station, office of an accountant or lawyer, pharmacy, insurance office, professional office of a health care provider, hospital, or other service establishment;

(G) a terminal, depot, or other station used for specified public transportation;

(H) a museum, library, gallery, or other place of public display or collection;

(I) a park, zoo, amusement park, or other place of recreation;

(J) a nursery, elementary, secondary, undergraduate, or postgraduate private school, or other place of education;

(K) a day care center, senior citizen center, homeless shelter, food bank, adoption agency, or other social service center establishment; and

(L) a gymnasium, health spa, bowling alley, golf course, or other place of exercise or recreation.

(8) Rail and railroad. The terms "rail" and "railroad" have the meaning given the term "railroad" in section 202(e) of the Federal Railroad Safety Act of 1970 (45 U.S.C. 431(e)) [49 USCS § 20102(1)].

(9) Readily achievable. The term "readily achievable" means easily accomplishable and able to be carried out without much difficulty or expense. In determining whether an action is readily achievable, factors to be considered include—

(A) the nature and cost of the action needed under this Act;

(B) the overall financial resources of the facility or facilities involved in the action; the number of persons employed at such facility; the effect on expenses and resources, or the impact otherwise of such action upon the operation of the facility;

(C) the overall financial resources of the covered entity; the overall size of the business of a covered entity with respect to the number of its employees; the number, type, and location of its facilities; and

(D) the type of operation or operations of the covered entity, including the composition, structure, and functions of the workforce of such entity; the geographic separateness, administrative or fiscal

7

relationship of the facility or facilities in question to the covered entity.

(10) Specified public transportation. The term "specified public transportation" means transportation by bus, rail, or any other conveyance (other than by aircraft) that provides the general public with general or special service (including charter service) on a regular and continuing basis.

(11) Vehicle. The term "vehicle" does not include a rail passenger car, railroad locomotive, railroad freight car, railroad caboose, or a railroad car described in section 242 [42 USCS § 12162] or covered under this title [42 USCS §§ 12181 et seq.].

## 42 U.S.C § 12182

(a) General rule. No individual shall be discriminated against on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation by any person who owns, leases (or leases to), or operates a place of public accommodation.

(b) Construction.

(1) General prohibition.

(A) Activities.

(i) Denial of participation. It shall be discriminatory to subject an individual or class of individuals on the basis of a disability or disabilities of such individual or class, directly, or through contractual, licensing, or other arrangements, to a denial of the opportunity of the individual or class to participate in or benefit from the goods, services, facilities, privileges, advantages, or accommodations of an entity.

(ii) Participation in unequal benefit. It shall be discriminatory to afford an individual or class of individuals, on the basis of a disability or disabilities of such individual or class, directly, or through contractual, licensing, or other arrangements with the opportunity to participate in or benefit from a good, service, facility, privilege, advantage, or accommodation that is not equal to that afforded to other individuals.

8

(iii) Separate benefit. It shall be discriminatory to provide an individual or class of individuals, on the basis of a disability or disabilities of such individual or class, directly, or through contractual, licensing, or other arrangements with a good, service, facility, privilege, advantage, or accommodation that is different or separate from that provided to other individuals, unless such action is necessary to provide the individual or class of individuals with a good, service, facility, privilege, advantage, or accommodation, or other opportunity that is as effective as that provided to others.

(iv) Individual or class of individuals. For purposes of clauses (i) through (iii) of this subparagraph, the term "individual or class of individuals" refers to the clients or customers of the covered public accommodation that enters into the contractual, licensing or other arrangement.

(B) Integrated settings. Goods, services, facilities, privileges, advantages, and accommodations shall be afforded to an individual with a disability in the most integrated setting appropriate to the needs of the individual.

(C) Opportunity to participate. Notwithstanding the existence of separate or different programs or activities provided in accordance with this section, an individual with a disability shall not be denied the opportunity to participate in such programs or activities that are not separate or different.

(D) Administrative methods. An individual or entity shall not, directly or through contractual or other arrangements, utilize standards or criteria or methods of administration—

(i) that have the effect of discriminating on the basis of disability; or

(ii) that perpetuate the discrimination of others who are subject to common administrative control.

(E) Association. It shall be discriminatory to exclude or otherwise deny equal goods, services, facilities, privileges, advantages, accommodations, or other opportunities to an individual or entity because of the known disability of an individual with whom the individual or entity is known to have a relationship or association.

9

(2) Specific prohibitions.

    (A) Discrimination. For purposes of subsection (a), discrimination includes—

        (i) the imposition or application of eligibility criteria that screen out or tend to screen out an individual with a disability or any class of individuals with disabilities from fully and equally enjoying any goods, services, facilities, privileges, advantages, or accommodations, unless such criteria can be shown to be necessary for the provision of the goods, services, facilities, privileges, advantages, or accommodations being offered;

        (ii) a failure to make reasonable modifications in policies, practices, or procedures, when such modifications are necessary to afford such goods, services, facilities, privileges, advantages, or accommodations to individuals with disabilities, unless the entity can demonstrate that making such modifications would fundamentally alter the nature of such goods, services, facilities, privileges, advantages, or accommodations;

        (iii) a failure to take such steps as may be necessary to ensure that no individual with a disability is excluded, denied services, segregated or otherwise treated differently than other individuals because of the absence of auxiliary aids and services, unless the entity can demonstrate that taking such steps would fundamentally alter the nature of the good, service, facility, privilege, advantage, or accommodation being offered or would result in an undue burden;

        (iv) a failure to remove architectural barriers, and communication barriers that are structural in nature, in existing facilities, and transportation barriers in existing vehicles and rail passenger cars used by an establishment for transporting individuals (not including barriers that can only be removed through the retrofitting of vehicles or rail passenger cars by the installation of a hydraulic or other lift), where such removal is readily achievable; and

        (v) where an entity can demonstrate that the removal of a barrier under clause (iv) is not readily achievable, a failure to make such goods, services, facilities, privileges, advantages, or

accommodations available through alternative methods if such methods are readily achievable.

(B) Fixed route system.

(i) Accessibility. It shall be considered discrimination for a private entity which operates a fixed route system and which is not subject to section 304 [42 USCS § 12184] to purchase or lease a vehicle with a seating capacity in excess of 16 passengers (including the driver) for use on such system, for which a solicitation is made after the 30th day following the effective date of this subparagraph, that is not readily accessible to and usable by individuals with disabilities, including individuals who use wheelchairs.

(ii) Equivalent service. If a private entity which operates a fixed route system and which is not subject to section 304 [42 USCS § 12184] purchases or leases a vehicle with a seating capacity of 16 passengers or less (including the driver) for use on such system after the effective date of this subparagraph that is not readily accessible to or usable by individuals with disabilities, it shall be considered discrimination for such entity to fail to operate such system so that, when viewed in its entirety, such system ensures a level of service to individuals with disabilities, including individuals who use wheelchairs, equivalent to the level of service provided to individuals without disabilities.

(C) Demand responsive system. For purposes of subsection (a), discrimination includes—

(i) a failure of a private entity which operates a demand responsive system and which is not subject to section 304 [42 USCS § 12184] to operate such system so that, when viewed in its entirety, such system ensures a level of service to individuals with disabilities, including individuals who use wheelchairs, equivalent to the level of service provided to individuals without disabilities; and

(ii) the purchase or lease by such entity for use on such system of a vehicle with a seating capacity in excess of 16 passengers (including the driver), for which solicitations are made after the 30th day following the effective date of this subparagraph, that

11

is not readily accessible to and usable by individuals with disabilities (including individuals who use wheelchairs) unless such entity can demonstrate that such system, when viewed in its entirety, provides a level of service to individuals with disabilities equivalent to that provided to individuals without disabilities.

(D) Over-the-road buses.

(i) Limitation on applicability. Subparagraphs (B) and (C) do not apply to over-the-road buses.

(ii) Accessibility requirements. For purposes of subsection (a), discrimination includes (I) the purchase or lease of an over-the-road bus which does not comply with the regulations issued under section 306(a)(2) [42 USCS § 12186(a)(2)] by a private entity which provides transportation of individuals and which is not primarily engaged in the business of transporting people, and (II) any other failure of such entity to comply with such regulations.

(3) Specific construction. Nothing in this title [42 USCS §§ 12181 et seq.] shall require an entity to permit an individual to participate in or benefit from the goods, services, facilities, privileges, advantages and accommodations of such entity where such individual poses a direct threat to the health or safety of others. The term "direct threat" means a significant risk to the health or safety of others that cannot be eliminated by a modification of policies, practices, or procedures or by the provision of auxiliary aids or services.

# FEDERAL REGULATIONS

<u>28 C.F.R. § 35.130</u>

28 C.F.R. § 35.130 General prohibitions against discrimination.
(a) No qualified individual with a disability shall, on the basis of disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any public entity.
(b)
    (1) A public entity, in providing any aid, benefit, or service, may not, directly or through contractual, licensing, or other arrangements, on the basis of disability—
        (i) Deny a qualified individual with a disability the opportunity to participate in or benefit from the aid, benefit, or service;
        (ii) Afford a qualified individual with a disability an opportunity to participate in or benefit from the aid, benefit, or service that is not equal to that afforded others;
        (iii) Provide a qualified individual with a disability with an aid, benefit, or service that is not as effective in affording equal opportunity to obtain the same result, to gain the same benefit, or to reach the same level of achievement as that provided to others;
        (iv) Provide different or separate aids, benefits, or services to individuals with disabilities or to any class of individuals with disabilities than is provided to others unless such action is necessary to provide qualified individuals with disabilities with aids, benefits, or services that are as effective as those provided to others;
        (v) Aid or perpetuate discrimination against a qualified individual with a disability by providing significant assistance to an agency, organization, or person that discriminates on the basis of disability in providing any aid, benefit, or service to beneficiaries of the public entity's program;
        (vi) Deny a qualified individual with a disability the opportunity to participate as a member of planning or advisory boards;

13

(vii) Otherwise limit a qualified individual with a disability in the enjoyment of any right, privilege, advantage, or opportunity enjoyed by others receiving the aid, benefit, or service.

(2) A public entity may not deny a qualified individual with a disability the opportunity to participate in services, programs, or activities that are not separate or different, despite the existence of permissibly separate or different programs or activities.

(3) A public entity may not, directly or through contractual or other arrangements, utilize criteria or methods of administration:

(i) That have the effect of subjecting qualified individuals with disabilities to discrimination on the basis of disability;

(ii) That have the purpose or effect of defeating or substantially impairing accomplishment of the objectives of the public entity's program with respect to individuals with disabilities; or

(iii) That perpetuate the discrimination of another public entity if both public entities are subject to common administrative control or are agencies of the same State.

(4) A public entity may not, in determining the site or location of a facility, make selections—

(i) That have the effect of excluding individuals with disabilities from, denying them the benefits of, or otherwise subjecting them to discrimination; or

(ii) That have the purpose or effect of defeating or substantially impairing the accomplishment of the objectives of the service, program, or activity with respect to individuals with disabilities.

(5) A public entity, in the selection of procurement contractors, may not use criteria that subject qualified individuals with disabilities to discrimination on the basis of disability.

(6) A public entity may not administer a licensing or certification program in a manner that subjects qualified individuals with disabilities to discrimination on the basis of disability, nor may a public entity establish requirements for the programs or activities of licensees or certified entities that subject qualified individuals with disabilities to discrimination on the basis of disability. The programs or activities of entities that are licensed or certified by a public entity are not, themselves, covered by this part.

(7)

14

(i) A public entity shall make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability, unless the public entity can demonstrate that making the modifications would fundamentally alter the nature of the service, program, or activity.

(ii) A public entity is not required to provide a reasonable modification to an individual who meets the definition of "disability" solely under the "regarded as" prong of the definition of "disability" at § 35.108(a)(1)(iii).

(8) A public entity shall not impose or apply eligibility criteria that screen out or tend to screen out an individual with a disability or any class of individuals with disabilities from fully and equally enjoying any service, program, or activity, unless such criteria can be shown to be necessary for the provision of the service, program, or activity being offered.

(c) Nothing in this part prohibits a public entity from providing benefits, services, or advantages to individuals with disabilities, or to a particular class of individuals with disabilities beyond those required by this part.

(d) A public entity shall administer services, programs, and activities in the most integrated setting appropriate to the needs of qualified individuals with disabilities.

(e)

(1) Nothing in this part shall be construed to require an individual with a disability to accept an accommodation, aid, service, opportunity, or benefit provided under the ADA or this part which such individual chooses not to accept.

(2) Nothing in the Act or this part authorizes the representative or guardian of an individual with a disability to decline food, water, medical treatment, or medical services for that individual.

(f) A public entity may not place a surcharge on a particular individual with a disability or any group of individuals with disabilities to cover the costs of measures, such as the provision of auxiliary aids or program accessibility, that are required to provide that individual or group with the nondiscriminatory treatment required by the Act or this part.

(g) A public entity shall not exclude or otherwise deny equal services, programs, or activities to an individual or entity because of the known disability of an individual with whom the individual or entity is known to have a relationship or association.

15

(h) A public entity may impose legitimate safety requirements necessary for the safe operation of its services, programs, or activities. However, the public entity must ensure that its safety requirements are based on actual risks, not on mere speculation, stereotypes, or generalizations about individuals with disabilities.

(i) Nothing in this part shall provide the basis for a claim that an individual without a disability was subject to discrimination because of a lack of disability, including a claim that an individual with a disability was granted a reasonable modification that was denied to an individual without a disability.

**MONTANA STATE CONSTITUTION**

<u>Mont. Const. art. II, § 4</u>

The dignity of the human being is inviolable. No person shall be denied the equal protection of the laws. Neither the state nor any person, firm, corporation, or institution shall discriminate against any person in the exercise of his civil or political rights on account of race, color, sex, culture, social origin or condition, or political or religious ideas.

**MONTANA CODE ANNOTATED STATUTES**

Mont. Code Ann. § 20-5-403

20-5-403.   Immunization required -- release and acceptance of immunization records. (1) The governing authority of any school other than a postsecondary school may not allow a person to attend as a pupil unless the person:

    (a)   has been immunized against varicella, diphtheria, pertussis, tetanus, poliomyelitis, rubella, mumps, and measles (rubeola) in the manner and with immunizing agents approved by the department;

    (b)   has been immunized against Haemophilus influenza type "b" before enrolling in a preschool if under 5 years of age;

    (c)   qualifies for conditional attendance; or

    (d)   files for an exemption as provided in 20-5-405.

(2)   (a)  The governing authority of a postsecondary school may not allow a person to attend as a pupil unless the person:

        (i)   has been immunized against rubella and measles (rubeola) in the manner and with immunizing agents approved by the department; or

        (ii)  files for an exemption as provided in 20-5-405.

    (b)   The governing authority of a postsecondary school may, as a condition of attendance, impose immunization requirements that are more stringent than those required by this part, subject to the exemptions provided for in 20-5-405.

(3)   A pupil who transfers from one school district to another may photocopy immunization records in the possession of the school of origin. The school district to which a pupil transfers shall accept the photocopy as evidence of immunization. Within 30 days after a transferring pupil ceases attendance at the school of origin, the school shall retain a certified copy for the permanent record and send the original immunization records for the pupil to the school district to which the pupil transfers.

Mont. Code Ann. § 49-2-312

49-2-312.   Discrimination based on vaccination status or possession of immunity passport prohibited -- definitions. (1) Except as provided in subsection (2), it is an unlawful discriminatory practice for:

18

(a)    a person or a governmental entity to refuse, withhold from, or deny to a person any local or state services, goods, facilities, advantages, privileges, licensing, educational opportunities, health care access, or employment opportunities based on the person's vaccination status or whether the person has an immunity passport;

(b)    an employer to refuse employment to a person, to bar a person from employment, or to discriminate against a person in compensation or in a term, condition, or privilege of employment based on the person's vaccination status or whether the person has an immunity passport; or

(c)    a public accommodation to exclude, limit, segregate, refuse to serve, or otherwise discriminate against a person based on the person's vaccination status or whether the person has an immunity passport.

(2)    This section does not apply to vaccination requirements set forth for schools pursuant to Title 20, chapter 5, part 4, or day-care facilities pursuant to Title 52, chapter 2, part 7.

(3)    (a)  A person, governmental entity, or an employer does not unlawfully discriminate under this section if they recommend that an employee receive a vaccine.

(b)    A health care facility, as defined in 50-5-101, does not unlawfully discriminate under this section if it complies with both of the following:

(i)    asks an employee to volunteer the employee's vaccination or immunization status for the purpose of determining whether the health care facility should implement reasonable accommodation measures to protect the safety and health of employees, patients, visitors, and other persons from communicable diseases. A health care facility may consider an employee to be nonvaccinated or nonimmune if the employee declines to provide the employee's vaccination or immunization status to the health care facility for purposes of determining whether reasonable accommodation measures should be implemented.

(ii)  implements reasonable accommodation measures for employees, patients, visitors, and other persons who are not vaccinated or not immune to protect the safety and health of employees, patients, visitors, and other persons from communicable diseases.

(4)    An individual may not be required to receive any vaccine whose use is allowed under an emergency use authorization or any vaccine undergoing safety trials.

19

(5)  As used in this section, the following definitions apply:

(a)  "Immunity passport" means a document, digital record, or software application indicating that a person is immune to a disease, either through vaccination or infection and recovery.

(b)  "Vaccination status" means an indication of whether a person has received one or more doses of a vaccine.


Mont. Code Ann. § 49-3-313.

49-2-313.  Exemption. A licensed nursing home, long-term care facility, or assisted living facility is exempt from compliance with 49-2-312 during any period of time that compliance with 49-2-312 would result in a violation of regulations or guidance issued by the centers for medicare and medicaid services or the centers for disease control and prevention.


Mont. Code Ann. § 50-5-101.

50-5-101.  Definitions. As used in parts 1 through 3 of this chapter, unless the context clearly indicates otherwise, the following definitions apply:

(1)  "Accreditation" means a designation of approval.

(2)  "Accreditation association for ambulatory health care" means the organization nationally recognized by that name that surveys outpatient centers for surgical services upon their requests and grants accreditation status to the outpatient centers for surgical services that it finds meet its standards and requirements.

(3)  "Activities of daily living" means tasks usually performed in the course of a normal day in a resident's life that include eating, walking, mobility, dressing, grooming, bathing, toileting, and transferring.

(4)  "Adult day-care center" means a facility, freestanding or connected to another health care facility, that provides adults, on a regularly scheduled basis, with the care necessary to meet the needs of daily living but that does not provide overnight care.

(5)  (a)  "Adult foster care home" means a private home or other facility that offers, except as provided in 50-5-216, only light personal care or custodial care to four or fewer disabled adults or aged persons who are not related to the owner or

20

manager of the home by blood, marriage, or adoption or who are not under the full guardianship of the owner or manager.

    (b)   As used in this subsection (5), the following definitions apply:

        (i)   "Aged person" means a person as defined by department rule as aged.

        (ii)  "Custodial care" means providing a sheltered, family-type setting for an aged person or disabled adult so as to provide for the person's basic needs of food and shelter and to ensure that a specific person is available to meet those basic needs.

        (iii)  "Disabled adult" means a person who is 18 years of age or older and who is defined by department rule as disabled.

        (iv)  (A)  "Light personal care" means assisting the aged person or disabled adult in accomplishing such personal hygiene tasks as bathing, dressing, and hair grooming and supervision of prescriptive medicine administration.

            (B)   The term does not include the administration of prescriptive medications.

(6)   "Affected person" means an applicant for a certificate of need, a long-term care facility located in the geographic area affected by the application, an agency that establishes rates for long-term care facilities, or a third-party payer who reimburses long-term care facilities in the area affected by the proposal.

(7)   "Assisted living facility" means a congregate residential setting that provides or coordinates personal care, 24-hour supervision and assistance, both scheduled and unscheduled, and activities and health-related services.

(8)   "Capital expenditure" means:

    (a)   an expenditure made by or on behalf of a long-term care facility that, under generally accepted accounting principles, is not properly chargeable as an expense of operation and maintenance; or

    (b)   a lease, donation, or comparable arrangement that would be a capital expenditure if money or any other property of value had changed hands.

(9)   "Certificate of need" means a written authorization by the department for a person to proceed with a proposal subject to 50-5-301.

(10)  "Chemical dependency facility" means a facility whose function is the treatment, rehabilitation, and prevention of the use of any chemical substance, including alcohol, that creates behavioral or health problems and endangers the

21

health, interpersonal relationships, or economic function of an individual or the public health, welfare, or safety.

(11) "Clinical laboratory" means a facility for the microbiological, serological, chemical, hematological, radiobioassay, cytological, immunohematological, pathological, or other examination of materials derived from the human body for the purpose of providing information for the diagnosis, prevention, or treatment of a disease or assessment of a medical condition.

(12) "College of American pathologists" means the organization nationally recognized by that name that surveys clinical laboratories upon their requests and accredits clinical laboratories that it finds meet its standards and requirements.

(13) "Commission on accreditation of rehabilitation facilities" means the organization nationally recognized by that name that surveys rehabilitation facilities upon their requests and grants accreditation status to a rehabilitation facility that it finds meets its standards and requirements.

(14) "Comparative review" means a joint review of two or more certificate of need applications that are determined by the department to be competitive in that the granting of a certificate of need to one of the applicants would substantially prejudice the department's review of the other applications.

(15) "Congregate" means the provision of group services designed especially for elderly or disabled persons who require supportive services and housing.

(16) "Construction" means the physical erection of a new health care facility and any stage of the physical erection, including groundbreaking, or remodeling, replacement, or renovation of:

    (a)   an existing health care facility; or

    (b)   a long-term care facility as defined in 50-5-301.

(17) "Council on accreditation" means the organization nationally recognized by that name that surveys behavioral treatment programs, chemical dependency treatment programs, residential treatment facilities, and mental health centers upon their requests and grants accreditation status to programs and facilities that it finds meet its standards and requirements.

(18) "Critical access hospital" means a facility that is located in a rural area, as defined in 42 U.S.C. 1395ww(d)(2)(D), and that has been designated by the department as a critical access hospital pursuant to 50-5-233.

(19) "Department" means the department of public health and human services provided for in 2-15-2201.

(20)  "DNV healthcare, inc." means the company nationally recognized by that name that surveys hospitals upon their requests and grants accreditation status to a hospital that it finds meets its standards and requirements.

(21)  "Eating disorder center" means a facility that specializes in the treatment of eating disorders.

(22)  "End-stage renal dialysis facility" means a facility that specializes in the treatment of kidney diseases and includes freestanding hemodialysis units.

(23)  "Federal acts" means federal statutes for the construction of health care facilities.

(24)  "Governmental unit" means the state, a state agency, a county, municipality, or political subdivision of the state, or an agency of a political subdivision.

(25)  "Healthcare facilities accreditation program" means the program nationally recognized by that name that surveys health care facilities upon their requests and grants accreditation status to a health care facility that it finds meets its standards and requirements.

(26)  (a)  "Health care facility" or "facility" means all or a portion of an institution, building, or agency, private or public, excluding federal facilities, whether organized for profit or not, that is used, operated, or designed to provide health services, medical treatment, or nursing, rehabilitative, or preventive care to any individual. The term includes chemical dependency facilities, critical access hospitals, eating disorder centers, end-stage renal dialysis facilities, home health agencies, home infusion therapy agencies, hospices, hospitals, infirmaries, long-term care facilities, intermediate care facilities for the developmentally disabled, medical assistance facilities, mental health centers, outpatient centers for primary care, outpatient centers for surgical services, rehabilitation facilities, residential care facilities, and residential treatment facilities.

> (b)   The term does not include offices of private physicians, dentists, or other physical or mental health care workers regulated under Title 37, including licensed addiction counselors.

(27)  "Home health agency" means a public agency or private organization or subdivision of the agency or organization that is engaged in providing home health services to individuals in the places where they live. Home health services must include the services of a licensed registered nurse and at least one other therapeutic service and may include additional support services.

(28)  "Home infusion therapy agency" means a health care facility that provides home infusion therapy services.

23

(29) "Home infusion therapy services" means the preparation, administration, or furnishing of parenteral medications or parenteral or enteral nutritional services to an individual in that individual's residence. The services include an educational component for the patient, the patient's caregiver, or the patient's family member.

(30) "Hospice" means a coordinated program of home and inpatient health care that provides or coordinates palliative and supportive care to meet the needs of a terminally ill patient and the patient's family arising out of physical, psychological, spiritual, social, and economic stresses experienced during the final stages of illness and dying and that includes formal bereavement programs as an essential component. The term includes:

    (a)   an inpatient hospice facility, which is a facility managed directly by a medicare-certified hospice that meets all medicare certification regulations for freestanding inpatient hospice facilities; and

    (b)   a residential hospice facility, which is a facility managed directly by a licensed hospice program that can house three or more hospice patients.

(31)  (a)  "Hospital" means a facility providing, by or under the supervision of licensed physicians, services for medical diagnosis, treatment, rehabilitation, and care of injured, disabled, or sick individuals. Except as otherwise provided by law, services provided must include medical personnel available to provide emergency care onsite 24 hours a day and may include any other service allowed by state licensing authority. A hospital has an organized medical staff that is on call and available within 20 minutes, 24 hours a day, 7 days a week, and provides 24-hour nursing care by licensed registered nurses. The term includes:

        (i)   hospitals specializing in providing health services for psychiatric, developmentally disabled, and tubercular patients; and

        (ii)  specialty hospitals.

    (b)   The term does not include critical access hospitals.

    (c)   The emergency care requirement for a hospital that specializes in providing health services for psychiatric, developmentally disabled, or tubercular patients is satisfied if the emergency care is provided within the scope of the specialized services provided by the hospital and by providing 24-hour nursing care by licensed registered nurses.

(32) "Infirmary" means a facility located in a university, college, government institution, or industry for the treatment of the sick or injured, with the following subdefinitions:

    (a)   an "infirmary--A" provides outpatient and inpatient care;

(b)   an "infirmary--B" provides outpatient care only.

(33)  (a)  "Intermediate care facility for the developmentally disabled" means a facility or part of a facility that provides intermediate developmental disability care for two or more persons.

(b)   The term does not include community homes for persons with developmental disabilities that are licensed under 53-20-305 or community homes for persons with severe disabilities that are licensed under 52-4-203.

(34)  "Intermediate developmental disability care" means the provision of intermediate nursing care services, health-related services, and social services for persons with a developmental disability, as defined in 53-20-102, or for persons with related problems.

(35)  "Intermediate nursing care" means the provision of nursing care services, health-related services, and social services under the supervision of a licensed nurse to patients not requiring 24-hour nursing care.

(36)  "Licensed health care professional" means a licensed physician, physician assistant, advanced practice registered nurse, or registered nurse who is practicing within the scope of the license issued by the department of labor and industry.

(37)  (a)  "Long-term care facility" means a facility or part of a facility that provides skilled nursing care, residential care, intermediate nursing care, or intermediate developmental disability care to a total of two or more individuals or that provides personal care.

(b)   The term does not include community homes for persons with developmental disabilities licensed under 53-20-305; community homes for persons with severe disabilities, licensed under 52-4-203; youth care facilities, licensed under 52-2-622; hotels, motels, boardinghouses, roominghouses, or similar accommodations providing for transients, students, or individuals who do not require institutional health care; or correctional facilities operating under the authority of the department of corrections.

(38)  "Medical assistance facility" means a facility that meets both of the following:

(a)   provides inpatient care to ill or injured individuals before their transportation to a hospital or that provides inpatient medical care to individuals needing that care for a period of no longer than 96 hours unless a longer period is required because transfer to a hospital is precluded because of inclement weather or emergency conditions. The department or its

designee may, upon request, waive the 96-hour restriction retroactively and on a case-by-case basis if the individual's attending physician, physician assistant, or nurse practitioner determines that the transfer is medically inappropriate and would jeopardize the health and safety of the individual.

(b)   either is located in a county with fewer than six residents a square mile or is located more than 35 road miles from the nearest hospital.

(39)  "Mental health center" means a facility providing services for the prevention or diagnosis of mental illness, the care and treatment of mentally ill patients, the rehabilitation of mentally ill individuals, or any combination of these services.

(40)  "Nonprofit health care facility" means a health care facility owned or operated by one or more nonprofit corporations or associations.

(41)  "Offer" means the representation by a health care facility that it can provide specific health services.

(42)  (a)  "Outdoor behavioral program" means a program that provides treatment, rehabilitation, and prevention for behavioral problems that endanger the health, interpersonal relationships, or educational functions of a youth and that:

(i)   serves either adjudicated or nonadjudicated youth;

(ii)  charges a fee for its services; and

(iii) provides all or part of its services in the outdoors.

(b)   "Outdoor behavioral program" does not include recreational programs such as boy scouts, girl scouts, 4-H clubs, or other similar organizations.

(43)  "Outpatient center for primary care" means a facility that provides, under the direction of a licensed physician, either diagnosis or treatment, or both, to ambulatory patients and that is not an outpatient center for surgical services.

(44)  "Outpatient center for surgical services" means a clinic, infirmary, or other institution or organization that is specifically designed and operated to provide surgical services to patients not requiring hospitalization and that may include recovery care beds.

(45)  "Patient" means an individual obtaining services, including skilled nursing care, from a health care facility.

(46)  "Person" means an individual, firm, partnership, association, organization, agency, institution, corporation, trust, estate, or governmental unit, whether organized for profit or not.

(47)  "Personal care" means the provision of services and care for residents who need some assistance in performing the activities of daily living.

26

(48)  "Practitioner" means an individual licensed by the department of labor and industry who has assessment, admission, and prescription authority.

(49)  "Recovery care bed" means, except as provided in 50-5-235, a bed occupied for less than 24 hours by a patient recovering from surgery or other treatment.

(50)  "Rehabilitation facility" means a facility that is operated for the primary purpose of assisting in the rehabilitation of disabled individuals by providing comprehensive medical evaluations and services, psychological and social services, or vocational evaluation and training or any combination of these services and in which the major portion of the services is furnished within the facility.

(51)  "Resident" means an individual who is in long-term care facility or in a residential care facility.

(52)  "Residential care facility" means an adult day-care center, an adult foster care home, an assisted living facility, or a retirement home.

(53)  "Residential psychiatric care" means active psychiatric treatment provided in a residential treatment facility to psychiatrically impaired individuals with persistent patterns of emotional, psychological, or behavioral dysfunction of such severity as to require 24-hour supervised care to adequately treat or remedy the individual's condition. Residential psychiatric care must be individualized and designed to achieve the patient's discharge to less restrictive levels of care at the earliest possible time.

(54)  "Residential treatment facility" means a facility operated for the primary purpose of providing residential psychiatric care to individuals under 21 years of age.

(55)  "Retirement home" means a building or buildings in which separate living accommodations are rented or leased to individuals who use those accommodations as their primary residence.

(56)  "Skilled nursing care" means the provision of nursing care services, health-related services, and social services under the supervision of a licensed registered nurse on a 24-hour basis.

(57)  (a)  "Specialty hospital" means a subclass of hospital that is exclusively engaged in the diagnosis, care, or treatment of one or more of the following categories:

> (i)   patients with a cardiac condition;
> (ii)  patients with an orthopedic condition;
> (iii) patients undergoing a surgical procedure; or

27

        (iv)  patients treated for cancer-related diseases and receiving oncology services.

(b)    For purposes of this subsection (57), a specialty hospital may provide other services for medical diagnosis, treatment, rehabilitation, and care of injured, disabled, or sick individuals as otherwise provided by law if the care encompasses 35% or less of the hospital services.

(c)    The term "specialty hospital" does not include:

        (i)   psychiatric hospitals;

        (ii)  rehabilitation hospitals;

        (iii) children's hospitals;

        (iv)  long-term care hospitals; or

        (v)   critical access hospitals.

(58)  "State long-term care facilities plan" means the plan prepared by the department to project the need for long-term care facilities within Montana and approved by the governor and a statewide health coordinating council appointed by the director of the department.

(59)  "Swing bed" means a bed approved pursuant to 42 U.S.C. 1395tt to be used to provide either acute care or extended skilled nursing care to a patient.

(60)  "The joint commission" means the organization nationally recognized by that name that surveys health care facilities upon their requests and grants accreditation status to a health care facility that it finds meets its standards and requirements.

# MONTANA REGULATIONS

Mont. Admin. R. 37.395.140

37.95.140    IMMUNIZATION

(1) Before a child may attend a Montana day care facility, that facility must be provided with the documentation required by (5) that the child has been immunized as required for the child's age group against measles, rubella, mumps, poliomyelitis, diphtheria, pertussis (whooping cough), tetanus, varicella, hepatitis B, pneumococcal, and Haemophilus influenza type B, unless the child qualifies for conditional attendance in accordance with (7):

| Age at Entry | Number of Doses-Vaccine Type |
|---|---|
| under 2 months old | no vaccinations required |
| by 3 months of age | 1 dose of polio vaccine<br>1 dose of DTP vaccine<br>1 dose of Hib vaccine<br>1 dose of Hep B vaccine<br>1 dose of PCV vaccine |
| by 5 months of age | 2 doses of polio vaccine<br>2 doses of DTP vaccine<br>2 doses of Hib vaccine<br>2 doses of Hep B vaccine<br>2 doses of PCV vaccine |
| by 7 months of age | 2 doses of polio vaccine<br>3 doses of DTP vaccine<br>*2 or 3 doses of Hib vaccine<br>2 doses of Hep B vaccine<br>3 doses of PCV vaccine |
| by 16 months of age | 2 doses of polio vaccine<br>3 doses of DTP vaccine |

29

1 dose of varicella vaccine
1 dose of MMR vaccine
*3 or 4 doses of Hib vaccine
2 doses of Hep B vaccine
*4 doses of PCV vaccine

by 19 months of age          1 dose of varicella vaccine
                             3 doses of polio vaccine
                             4 doses of DTP vaccine
                             1 dose of MMR vaccine
                             *3 or 4 doses of Hib vaccine
                             3 doses of Hep B vaccine
                             *4 doses of PCV vaccine

By 6 years of age            3 doses of polio vaccine, one given after the 4th
birthday
                             4 doses of DTP vaccine, one given after the 4th
birthday
                             2 doses of varicella vaccine
                             2 doses of MMR vaccine
                             3 doses of Hep B vaccine

By 12 years of age           3 doses of polio vaccine, one given after the 4th
birthday
                             1 dose of Tdap vaccine
                             2 doses of varicella vaccine
                             2 doses of MMR vaccine
                             3 doses of Hep B vaccine

(*) varies depending on vaccine type used or the ACIP catch-up schedule.

(2) Hib and PCV vaccines are not required or recommended for children five years of age and older.

(3) Doses of MMR and varicella vaccines, to be acceptable under this rule, must be given no earlier than 12 months of age and a child who received a dose prior to 12 months of age must be revaccinated; however, vaccine doses given up to four days

30

before the minimum interval or age are counted as valid. Live vaccines not administered at the same visit must be separated by at least four weeks.

(4) Vaccines immunizing against diphtheria, pertussis, and tetanus must be administered as follows:

    (a) a child less than seven years of age must be administered four or more doses of DTP or DTaP vaccine, at least one dose of which must be given after the fourth birthday;

    (b) DT vaccine administered to a child less than seven years of age is acceptable for purposes of this rule only if accompanied by a medical exemption meeting the requirements of ARM 37.114.715 that exempt the child from pertussis vaccination; and

    (c) a child seven years old or older who has not completed the requirement in (1) must receive additional doses of Tdap vaccine or Td vaccine to become current in accordance with the ACIP schedule.

(5) Immunization history must be recorded on the Montana certificate of immunization form (HES-101) provided by the department or on a physician- or clinic-provided immunization record, which must include:

    (a) the name of the physician or clinic;

    (b) the name and birth date of the child; and

    (c) the date and type of immunization.

(6) In order to continue to attend a day care facility, a child must continue to be immunized on the schedule described in (1) and must be immediately excluded from attendance in the day care facility if the child is not vaccinated on that schedule with all of the required vaccines, or does not have on file at the day care facility a record of medical exemption or a conditional enrollment form which indicates that no vaccine dose is past due.

(7) A child may initially conditionally attend a day care facility if:

    (a) the child has received at least one dose of each of the vaccines required for the child's age;

    (b) a form prescribed by the department documenting the child's conditional immunization status is on file at the day care facility and is attached to the department's Montana certificate of immunization (HES-101); and

    (c) the child is not past due for the next required dose (as noted on the conditional enrollment form) of the vaccine in question.

(8) If a child in attendance at the day care facility, a resident of the day care facility, or a staff member, or volunteer contracts any of the diseases for which this

31

rule requires immunization, all individuals infected and all persons attending the day care facility who are not completely immunized against the disease in question or who are exempted from immunization must be excluded from the day care facility until the local health authority indicates to the day care facility that the outbreak is over.

(9) The day care facility must maintain a written record of immunization status of each staff member, enrolled child, and each child of a staff member who resides at the day care facility. The facility must make those records available during normal working hours to representatives of the department or the local health authority.

(10) A child under five years of age seeking to attend a day care facility is not required to be immunized against Haemophilus influenza type B if the parent or guardian of the child objects thereto in a signed, written statement indicating that the proposed immunization interferes with the free exercise of the religious beliefs of the person signing the statement. A claim of exemption on religious grounds must be notarized and maintained on an Affidavit of Exemption on Religious Grounds form (HES-113) provided by the department.

(11) A child is not required to have any immunizations which are medically contraindicated. A written and signed statement from a physician that an immunization otherwise required by (1) is medically contraindicated will exempt a child from those immunization requirements as deemed necessary by the physician. It is preferred, but not mandatory, that a physician's medical exemption be recorded on HES-101. Medical exemption documentation must include:

   (a) which specific immunization is contraindicated;

   (b) the period of time during which the immunization is contraindicated;

   (c) the reasons for the medical contraindication; and

   (d) when deemed necessary by a physician, the results of immunity testing. The tests must indicate serological evidence of immunity and must be performed by a CLIA approved lab.

(12)  A child experiencing homelessness or a child in foster care is exempt from required immunizations outlined in (1) for a 30-day grace period beginning the first day the child attends a child care facility as verified on the sign-in/sign-out records.

   (a) The child experiencing homelessness must meet the definition in Section 725 of Subtitle VII-B of the McKinney-Vento Act (42 U.S.C. 11434a) (98.2).

32

(b) A child is in foster care when the foster care environment meets ARM 37.50.101(4).

(c) A child must meet the immunization requirement for conditional enrollment outlined in (7) before the end of the 30-day period.

(d) A child may not be granted grace periods consecutively.